**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**ADIRONDACK TRANSIT LINES, INC. (d/b/a Adirondack Trailways); PINE HILL-KINGSTON BUS CORP. (d/b/a Pine Hill Trailways); and PASSENGER BUS CORPORATION (d/b/a New York Trailways),**

**Plaintiffs,**

        **vs.**

**GREYHOUND LINES, INC.; and FIRSTGROUP AMERICA, INC.,**

**Defendants.**

Civil Case No.: 1:15-CV-1227[LEK/CFH]

**COMPLAINT**

**Jury Trial Demanded**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    PARTIES ..............................................................................................................1

       A.    Plaintiffs......................................................................................................1

       B.    Defendants ...................................................................................................2

III.   JURISDICTION AND VENUE ..........................................................................4

IV.    FULFILLMENT OF CONDITIONS PRECEDENT..........................................5

V.     FACTS ..................................................................................................................5

       A.    History of the RPA.......................................................................................5

       B.    Dispute Regarding Pool Revenues...............................................................9

       C.    GLI is Adirondack's Fiduciary .................................................................14

       D.    Adirondack's Ticket Sales After The Second Amendment.......................17

       E.    Cost-to-Sell Rate .......................................................................................19

       F.    Defendants' RPA Mileage Deficit between 2011 and 2013.....................21

       G.    Defendants Terminate Through Services Agreement.................................26

       H.    GLI has Charged Non-Revenue Miles to the Revenue Pool .....................27

       I.    GLI Is Changing Its Business Model to Restricted Capacity ..................28

VI.    CAUSES OF ACTION.......................................................................................29

       A.    First Cause of Action: Breach of Contract.................................................29

       B.    Second Cause of Action: Breach of Fiduciary Duties ...............................32

       C.    Third Cause of Action: Fraud ....................................................................34

       D.    Fourth Cause of Action: Negligent Misrepresentation ...........................35

       E.    Fifth Cause of Action: Declaratory Judgment Construing the RPA.....................36

       F.    Sixth Cause of Action: Payment of Equipment Miles Under the
             Through Services Agreement ....................................................................37

VII.   Demand For Trial By Jury ................................................................................37

VIII.  Relief Requested .........................................................................................37

## I.    INTRODUCTION

1.     Plaintiffs Adirondack Transit Lines, Inc. (d/b/a Adirondack Trailways) ("Adirondack Trailways"), and its corporate affiliates, Pine Hill-Kingston Bus Corp. (d/b/a Pine Hill Trailways) ("Pine Hill Trailways"), and Passenger Bus Corporation (d/b/a New York Trailways) ("New York Trailways") (together referred to in the singular as "Plaintiff" or "Adirondack") bring this Complaint against Greyhound Lines, Inc. ("GLI") and FirstGroup America, Inc., (together, "Defendants") to recover amounts due and other monetary damages, and to obtain certain declaratory relief.

2.     Plaintiff Adirondack's claims arise primarily under the Revenue Pooling Agreement between Adirondack and GLI (to include three amendments to the RPA) (the "RPA") and other related agreements among the parties.

3.     GLI and each of the Adirondack companies are parties to the RPA.  Under the RPA, GLI and Adirondack jointly provide bus transportation services throughout New York State on designated "Pooled Routes", including in this judicial district, and they share with one another the revenues generated from those pooled operations.  The RPA is a 30-year contract which was executed in May 1997.  GLI and the Adirondack companies are jointly referred to herein as the "Pool partners".

## II.    PARTIES

A.    <u>Plaintiffs</u>

4.     Plaintiffs Adirondack Trailways, Pine Hill Trailways, and New York Trailways are each privately owned intercity bus companies that operate under a common private ownership.  Each is a corporation organized and existing under the law of the state of

1

New York and maintaining its principal place of business in this judicial district at 499 Hurley Ave., Hurley NY 12443.

5.      Adirondack is one of the largest intercity bus providers in New York State.  It has served the New York traveling public for nearly ninety years, and has been a family-owned business since it was founded in 1926.

6.      Adirondack provides intercity bus transportation throughout the entire state of New York, including both main corridors connecting large cities such as New York City, Buffalo, and Albany, and rural communities located off of the main corridors.  Adirondack Trailways and Pine Hill Trailways operate primarily in the eastern part of New York State and north to Montreal, Quebec, and New York Trailways operates primarily in the Western part of New York State and as far south as New York City.  On its major city-pair routes in New York State, Adirondack also provides pooled services with GLI, under their Revenue Pooling Agreement, described below.  Adirondack also operates a number of bus stations in New York State, and it serves other bus stations in both New York State and in Canada.

**B.      Defendants**

7.      Defendant Greyhound Lines, Inc. ("GLI") is a corporation organized and existing under the law of the state of Delaware and maintains its principal place of business at 350 N. St. Paul Street, Dallas, Texas 75201.  It is a wholly owned subsidiary of FirstGroup plc, a publicly traded company in the United Kingdom.   GLI provides intercity bus transportation across the United States (including along the major corridors of New York State, to include operations in this judicial district) and also in Canada and Mexico. Defendant GLI may be served by serving C T Corporation System, Defendant GLI's agent for service of process, at 111 Eighth Avenue, New York, New York, 10011.

2

8.      Upon information and belief, Defendant FirstGroup America, Inc. is a corporation organized and existing under the laws of Delaware and maintaining its principal place of business at 600 Vine Street, Cincinnati, Ohio 45202, and it is a wholly owned subsidiary of FirstGroup plc, the same entity owning GLI.  Upon information and belief, Greyhound Canada Transportation ULC ("GLC") is a division of Defendant FirstGroup America, Inc.  Upon information and belief, GLC is the successor to Greyhound Lines of Canada Ltd.  Defendant FirstGroup America, Inc., through its division GLC, operates in Canada and New York State, including between Toronto, Ontario and Buffalo, New York. Through GLC, Defendant FirstGroup America, Inc. regularly transacts business within, and contracts to supply services in, New York State, and it also derives substantial revenue from services rendered in New York State.  Defendant FirstGroup America, Inc. expects or should reasonably expect the operations of its GLC division within New York State to have consequences in the state, and it derives substantial revenue from interstate or international commerce.  As explained more fully below, certain liabilities that GLC had incurred for the use of Adirondack buses—including within this state—were incorporated into the monthly RPA account settlement process, which GLI prepared.  Defendant FirstGroup America, Inc. (including its division GLC) may be served through its agent for service of process, C T Corporation System, at 111 Eighth Avenue, New York, New York, 10011.

9.      GLC and GLI have been commonly-owned sister companies since 1999. Upon information and belief, FirstGroup plc wholly owns both GLI and FirstGroup America, Inc., and GLC is a division of FirstGroup America, Inc.  GLI and GLC are integrated companies; they share common executives and decision makers, and they act as alter egos of one another.  For purposes of the liabilities at issue here, GLI and FirstGroup America, Inc.

3

have treated GLC as a part of GLI and have ignored the separate existence of the two entities. Alternatively, GLI has operated as the agent for GLC and FirstGroup America, Inc. in New York for purposes of the liabilities at issue here.

### III.    JURISDICTION AND VENUE

10.    This is a civil action seeking judgment, declaratory relief, and damages. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(1) because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States. Alternatively, this Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(3) because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States and in which a citizen of a foreign state is an additional party.

11.    Venue is proper in the Northern District of New York at Albany under 28 USC § 1391(b)(1) because GLI's continuous operations and contacts in the Northern District of New York (including within the territory of the Albany division) make it a resident of this district and because Defendant FirstGroup America, Inc.'s continuous operations and contacts in New York State, including through its division GLC, make it a resident of New York State. Venue is also proper under 28 USC § 1391(b)(2) because GLI and Adirondack provide intercity bus transportation under the RPA throughout this judicial district, GLI operates bus terminals for the Greyhound-Adirondack Pool in this judicial district, and a substantial part of the events and omissions giving rise to Adirondack's claims occurred in this district and division.

## IV.    FULFILLMENT OF CONDITIONS PRECEDENT

12.     All relevant conditions precedent to the commencement of this lawsuit have been satisfied.  The RPA requires that disputes be submitted for non-binding arbitration before a party may seek other legal or equitable remedies.  The arbitration commenced on December 5, 2013.  The final award of the arbitrator has been issued and will be submitted by Adirondack.

13.     Pursuant to Paragraph 23 of the RPA, the findings of the arbitrator are non-binding, unless the parties mutually agree in writing in advance of the arbitration to a binding arbitration.  Because the parties have not agreed to submit these disputes to binding arbitration, the final decision rendered by the arbitrator is non-binding.  None of these disputes fall within the narrow category of disputes that are to be resolved through binding arbitration under the RPA.

## V.    FACTS

14.     This dispute arises from the RPA and a 2013 contract addressing a mileage deficit Defendants accumulated under the RPA.

**A.    History of the RPA**

15.     In the 1990s, GLI was a publicly owned company traded on the New York Stock Exchange, and it was in financial trouble.  GLI was suffering from aggressive competition, including competition from regional bus carriers such as Adirondack.  GLI approached Adirondack proposing a revenue pooling arrangement under which the companies would cease competing along the major corridors of New York State and would instead pool their operations.  Under federal law, if the Surface Transportation Board approves such a pooling agreement, the agreement is exempt from federal and state antitrust

laws as necessary to carry out the pooling arrangement.  49 U.S.C. § 14302(f).   Under the revenue pool concept, GLI and Adirondack would operate along the pooled corridors together as partners in a joint venture.  Through the arrangement, they would coordinate operations along the pooled corridors according to pre-negotiated percentages and combine revenues for distribution to each of them according to pre-negotiated percentages.

16.     GLI and Adirondack executed the RPA in May 1997, forming the Greyhound-Adirondack revenue pool (the "Pool") subject to approval by the Surface Transportation Board.  A true and correct copy of the RPA is submitted as Exhibit 1.  The RPA provides that its 30-year term would begin on the date of the STB's approval of the agreement.  The Surface Transportation Board found that the pooling arrangement in the RPA was in the public interest of the traveling public in New York State, and it approved the RPA in STB Decision No. MC-F-20910 (December 18, 1997).

17.      The RPA provides for Adirondack and GLI to pool their intercity bus service between Albany, NY and New York, NY; Buffalo NY and New York, NY; Buffalo, NY and Albany, NY; and New York, NY and Montreal, PQ, Canada.[1]   By subsequent agreement of the parties, the Pool no longer governs the portion of the New York-to-Montreal routes north of the Canadian border.

18.     The RPA requires each Pool partner to operate a set percentage annually of the revenue miles operated by the revenue Pool (Exhibit 1 at ¶ 3(d)), and it allocates to each Pool partner a set percentage of the revenue collected through the Pooled operations.

---

[1] The RPA originally also pooled service on the route between Albany, NY and Long Island, NY, but the Pool partners subsequently removed that route from the Pool by agreement effective September 1, 2006.

(Exhibit 1 at ¶ 8(a))  GLI must operate 59.25% of the Pool's revenue miles, and Adirondack must operate 40.75%.  Adirondack shall receive 43.34% of Pool revenue and GLI shall receive 56.66%.[2]

19.     GLI and Adirondack signed the First Amendment of Revenue Pooling Agreement on July 15, 1999; the Second Amendment of Revenue Pooling Agreement on October 14, 1999; and the Third Amendment of Revenue Pooling Agreement on April 26, 2002.  True and correct copies of the amendments are submitted as Exhibits 2 – 4.  At the same time they signed the Second Amendment of the Revenue Pooling Agreement, GLI and Adirondack also signed the Greyhound-Adirondack Agreement, which is submitted as Exhibit 5.

20.     On behalf of Adirondack, Eugene Berardi, Jr. and Mark Boungard, the current President and CFO of Adirondack, respectively, negotiated the RPA and the amendments to the RPA.  No current member of GLI's management negotiated those agreements on behalf of GLI.  Messrs. Berardi and Boungard also negotiated the cost-to-sell rate arrangement with GLI (discussed below).  No current member of GLI's management negotiated that agreement on behalf of GLI.  Messrs. Berardi and Boungard also negotiated the agreement that Adirondack would receive a commission, as adjusted by GLI down to the cost-to-sell rate, on tickets for Pool travel printed on Adirondack paper (discussed below).  No current member of GLI's management negotiated that agreement on behalf of GLI.

---

[2] The percentages set forth in the RPA were renegotiated to these percentages, by agreement of GLI and Adirondack, when the Pool ceased operating the Albany-to-Long Island route.  The renegotiated percentages took effect on September 1, 2006.

21.     After failing to generate a profit for many years, GLI returned to profitability in 1998, the first year of the operations of the Greyhound-Adirondack Pool.  In or around the fall of 1998, shortly after beginning operations through the Pool, GLI entered into an agreement for its acquisition by Laidlaw International, Inc., and the acquisition was consummated in the spring of 1999.  At the time, Laidlaw International, Inc. already owned GLC (or its predecessor corporate entity), so from that time through October 2007, GLI and GLC (or its predecessor corporate entity) were both wholly owned subsidiaries of Laidlaw International, Inc.  FirstGroup Plc acquired Laidlaw International, Inc. (including GLI and GLC) effective October 1, 2007.  Since then, FirstGroup plc's stock price has fallen by more than 80%.  As a result, GLI and GLC are under pressure to help improve FirstGroup plc's financial performance.   That financial pressure has led GLI to attempt to keep more Pool revenue for itself and shift more of its expenses upon Adirondack, through actions and omissions described below.

22.     Pursuant to the RPA, GLI and Adirondack operate together on certain intercity bus routes in New York State; a map showing those routes is submitted as Exhibit 6. On those Pooled Routes, the parties are to jointly establish an agreed allocation of bus schedules between them, to operate buses on each of their allocated schedules so that every passenger who wants to travel on that schedule is able to do so, and to pool the revenues from those operations and distribute them according to pre-negotiated percentages.  Although the parties pool the revenues, each party bears its own costs of operating its buses.  This has given rise to incentives for GLI to retain more than its share of the revenue, while trying to shift more of its costs to Adirondack.

8

B.     **Dispute Regarding Pool Revenues**

      23.     In the RPA, the parties agreed to pool revenues collected from their pooled

operations.  The RPA defines the Gross Pool Revenue to be shared as follows:

> The revenues which shall be the subject of this Agreement ("Gross
> Pool Revenue") are **gross amounts received by ADT and GLI
> from the sale of passenger tickets** and package express shipments
> handled, regardless of where or by whom the tickets were sold or
> the busbills issued, **for the transportation of passengers** and
> express in scheduled, intercity bus service **over all or any portion
> of the Pooled Routes**, except that in the case of ADT, revenues
> derived from service to or from intermediate points between
> Albany, NY, and New York, NY, shall not be included in Gross
> Pool Revenue if such service does not operate to or via both New
> York, NY, and Albany, NY, and in the case of GLI, service
> between Sranton [sic], PA, and Binghampton [sic], NY, shall not
> be included in Gross Pool Revenue if such service is not operated
> in connection with a through bus service which operates to, from
> or via New York, NY.

(Exhibit 1 ¶ 1(b) (emphasis added)).

      24.     Paragraph 2(a) of the RPA states that "the gross sales amount received by

ADT and GLI for transportation over all or any portion of the Pooled Routes shall be

included in Gross Pool Revenue." (Id.¶ 2(a))  Paragraph 7, concerning the computation of

Net Pool Revenue, states:

> The **sum of the passenger revenue realized from operations
> over the Pooled Routes** by both parties, and the sum of package
> express handled at each of the terminals and agencies on the Pool
> Routes by both parties **shall be Gross Pool Revenue**.

(Exhibit 1 ¶ 7(a) (emphasis added)) Paragraph 7(b) requires those revenues (after deducting

certain expenses) to be distributed between the parties: "The remainder . . . shall be the

amount available for distribution to the parties ('Net Pool Revenue'), which shall be

distributed" between the parties in their respective pool share percentages (see id. ¶¶ 8(a)-

(b)), "as net revenue available from passenger operations ('Net Pool Passenger Revenue')

and net revenue available from package express operations ('Net Pool Express Revenue')." (<u>Id.</u> ¶ 7(b))

25.     By agreement, Adirondack's Pool share percentage of revenue is 43.34% and GLI's Pool share percentage of revenue is 56.66%.

26.     As the RPA states, the Pool partners agreed to pool the "gross sales amount received by ADT and GLI for transportation" (<u>id.</u> ¶ 2(a)) and to distribute those amounts between them.   At the time the RPA was written, it was uncommon for bus companies to add fees in addition to the stated fare for a ticket.   Nevertheless, the Pool partners defined Gross Pool Revenue broadly, to encompass all revenues received by the parties for transportation over the Pooled Routes.

### 1)     *Revenue from Fees*

27.     In the intervening years since execution of the RPA, GLI increased the price passengers pay for transportation on the Pooled Routes by: (1) adding new fee categories and charging them to Pool customers; (2) increasing the amount of certain existing fees and charging the increased fees to Pool customers; and (3) imposing new and more stringent requirements on the use of its tickets, resulting in increased collection of amounts from Pool customers in fees (for example, through fees charged for changing a ticketed schedule).   GLI made these changes without Adirondack's consent.   In these ways, GLI increased the revenues it received from the sale of tickets for transportation over the Pooled Routes, without increasing the stated fare of the Pool tickets.   GLI refuses to include the amounts it collects in fees in its calculation of Gross Pool Revenue, and it refuses to remit to Adirondack its Gross Pool Revenue portion (43.34%) of that fee revenue.

28.     By agreement, GLI performs the accounting for the Pool, including accounting for the Gross Pool Revenues each month.  GLI refuses to include fees in its calculation of Gross Pool Revenue.  GLI refuses to share information with Adirondack regarding the amounts of fee revenue it has collected.  Upon information and belief, the Pool's revenue from fees has become substantial in recent years, as GLI imposed new and increased fees and increasingly stringent restrictions on the redemption of tickets.  Adirondack has made numerous demands on GLI for payment.  However, GLI has failed and refused to pay as required by the contract.

### 2) *Revenue from Unredeemed Tickets*

29.     Since the RPA was signed, GLI has introduced changes to the Pool's accounting process, which results in GLI's collecting a disproportionate share of the Pool revenue from tickets purchased, but never redeemed, for travel.  GLI does not include that revenue in Gross Pool Revenue.

30.     In the beginning of the Pool, GLI and Adirondack each sold tickets for Pool travel through their own separate selling systems, and each collected the money from its own respective sales.  Each company performed its own accounting for the Pool revenue it collected.  Each party sold tickets for Pool travel in a percentage that approximated its Pool revenue percentage allocation under the RPA.

31.     In the beginning of the Pool, tickets were most often purchased in-person at the bus terminal, shortly prior to the bus departure.  As a result, it was rare for a ticket to be purchased but not redeemed for travel.  To the extent tickets for travel went unredeemed, each party kept that unearned revenue associated with the tickets it sold.  Because each party's sale of tickets for Pool travel approximated its Pool revenue allocation under the

11

RPA, the parties kept the unearned Pool revenue in percentages approximating their Pool revenue allocations.

32.     That changed upon implementation of the Second Amendment to the RPA, which was signed in 1999 and implemented by 2001.  As a result of the Second Amendment, sales that Adirondack made at many of its selling locations were made through GLI's TRIPS system and the associated revenue was collected by GLI.  Thus, the changes introduced by the Second Amendment led to GLI's keeping more than its Pool revenue allocation of Pool revenue from unredeemed tickets.

33.     The Second Amendment also made GLI the Pool's accountant.  GLI held the information about the amounts collected for Pool tickets that were never redeemed for travel.

34.     Adirondack raised concerns with GLI about unredeemed ticket revenue for many years, at least as early as 2004.  GLI has repeatedly assured Adirondack that the unredeemed ticket revenue is too small to justify the effort to calculate it.  Beginning around 2008, Adirondack began offering tickets for Pool travel for advanced purchase on the Internet.  Upon information and belief, Defendants began offering tickets for Pool travel for advanced purchase on the Internet at approximately the same time.  Since that time, advanced-purchase Internet sales have become increasingly popular with Pool customers.

35.     Under an advanced-purchase sales model, a customer's plans may change in the intervening period between the time of purchase and the time of scheduled travel, which may result in the customer's failure to use a purchased ticket.  Thus, unredeemed ticket revenue has increased as more tickets are sold in advance.

36.     In addition, in the beginning of the Pool, the Pool partners imposed few restrictions on the use of a ticket.  The tickets could be used at any time within a year of

purchase.  In more recent years, GLI has imposed increasingly stringent restrictions on the use of its tickets.  Today, unlike at the beginning of the Pool, most tickets are valid for use only on the particular day chosen at the time of purchase.  As a result, if the customer's plans change after purchasing the ticket, the customer may be unable to use the ticket without paying a fee for changing the ticket.  The fee is currently $20.  The full one-way ticket price for some of the Pool's schedules is less than $20.  Rather than pay the $20 fee, many Pool customers instead forfeit their tickets.

37.     In or around 2008, GLI admitted to Adirondack a trend showing an increase in the revenue from unredeemed tickets.  GLI promised to perform another study to confirm that the trend was continuing and to begin providing to Adirondack its proportional share of that unredeemed ticket revenue.  But GLI never provided that study, and it has refused Adirondack's requests to adjust the Pool accounting to include unredeemed ticket revenue in Gross Pool Revenue.

38.     GLI refuses to include in Gross Pool Revenue those amounts it receives from the sale of tickets that are never redeemed for travel.  GLI therefore deprives Adirondack of its proportional Pool share of that revenue.  On numerous occasions, Adirondack has asked GLI to quantify the amount of Pool revenue from unredeemed tickets, but GLI has refused to do so.

39.     Around 2014, Adirondack observed an unexplained discrepancy between the rate of increase in sales as reported in a weekly Pool sales report prepared by GLI, and the rate of increase in Pool revenue reported by GLI in the monthly Pool settlements.  It appeared to Adirondack that the growing discrepancy represented the increasing rate of unredeemed tickets.  Adirondack asked questions of GLI and requested an accounting

13

explaining the discrepancy.  GLI refused to provide an accounting and refused to adequately address the questions.  Instead, through a letter signed by a GLI Senior Vice President on September 19, 2014, GLI announced its decision to cease providing the weekly reports altogether.  On information and belief, GLI's decision to cease providing the weekly report was part of its effort to conceal from Adirondack the amounts of unredeemed ticket revenue.

C.      **GLI is Adirondack's Fiduciary**

40.     In the beginning of the Pool, GLI and Adirondack each performed their own accounting for their respective revenues brought into the Pool.  A few years into the Pool, GLI approached Adirondack, asking to change the way the Pool partners accounted for and reported their Pool ticket sales to the Pool.  GLI asked to become the Pool's accountant— including to assume responsibilities for accounting for the portion of revenue that Adirondack brought into the Pool.  As part of this proposed change, Adirondack would convert its ticket-selling systems at certain physical locations along the Pooled Routes over to GLI's system, known as "TRIPS".  Tickets Adirondack sold at those physical locations would be printed on GLI ticket stock.  Thereafter, the tickets for Pool travel sold by Adirondack at those locations would be processed through GLI's TRIPS system, the money collected would be paid to GLI, and Adirondack would receive a commission on the sale of the ticket through a bus terminal license agreement with GLI.  The proposal impacted only sales made from the ticket counter at physical locations on the Pooled Routes:  It left unaffected all of Adirondack's other sales outlets for tickets for Pool travel.

41.     Adirondack was skeptical of GLI's proposal.  GLI worked hard to convince Adirondack to place its trust in GLI and GLI's accounting processes for performance of these important functions.  Ultimately, GLI succeeded.

14

42.     In 1999, GLI and Adirondack signed the Second Amendment to the RPA.  At the same time, they signed the Greyhound-Adirondack Agreement (Exhibit 5), which provided for ongoing discussions regarding implementation of the Second Amendment. Those discussions took place in early 2000, and the parties agreed on an implementation plan.  During those discussions, GLI said it did not want to install TRIPS at some of Adirondack's locations on the Pooled Routes (despite the language in the Second Amendment stating TRIPS would be installed at "all" of Adirondack's "automated locations on the Pooled Routes"), due to cost.  GLI and Adirondack agreed which locations would be converted to the TRIPS system and would print tickets on GLI paper, in fulfillment of the Second Amendment.  That conversion was completed by around 2001.

43.     The Second Amendment vested in GLI the responsibility of accounting for, settling, and remitting to Adirondack Adirondack's portion of the Net Pool Revenue.  Thus, GLI became Adirondack's fiduciary for those purposes.  GLI also became Adirondack's agent for those purposes, which also imposes fiduciary obligations upon GLI.  Adirondack pays GLI 1.65% of Adirondack's share of the Gross Pool Revenue to perform those functions.  Since in or about May 2000, Adirondack has paid GLI more than $5,000,000 to perform as Adirondack's fiduciary in accounting for, settling, and remitting to Adirondack its portion of Net Pool Revenue.

44.     The fiduciary obligations created by the Second Amendment to the RPA are in addition to the other fiduciary duties already owed between GLI and Adirondack due to their relationship as partners in the Pool.  As a result of the Second Amendment, GLI holds the money and the sales records for Pool sales made at all of the major terminals along the Pooled Routes, including sales made by Adirondack.  Those records are kept solely in GLI's

15

possession, and Adirondack pays GLI to account for the Pool revenues and to provide Pool records to Adirondack upon request.  As a result of the Second Amendment, GLI is the gatekeeper to Adirondack's access to financial information and trends regarding the Pooled operations.

45.    GLI has withheld amounts, including fee revenue and revenue from unredeemed tickets, from Gross Pool Revenue.  It has stonewalled Adirondack's efforts to investigate the books and records of the Pool that Greyhound, as Adirondack's accountant for the Pooled operations, maintains in its control.

46.    After GLI failed to address many of Adirondack's informal requests for Pool financial information throughout 2012 and 2013, Adirondack exercised its audit rights under Paragraph 8(d) of the RPA.  In relevant part, Paragraph 8(d) provides:

> "[A]t ADT's request, but not less than quarterly, GLI shall make available to a certified public accounting firm designated by ADT or to ADT's company auditors, **all books and records maintained by GLI relating to this Agreement** at the place where the books and records are maintained and during normal business hours."

47.    Adirondack initiated its formal request under Paragraph 8(d) on November 21, 2013, requesting access to books and records regarding both revenue and miles.  After delaying for several months, GLI eventually began providing some data.  However, when Adirondack sought financial data regarding GLI's unredeemed ticket revenue, GLI refused to comply and abruptly terminated the audit.  (GLI's termination of the audit is discussed further below.)  Thus, GLI denied Adirondack access to the Pool's financial information, which is solely within GLI's control.  In doing so, GLI breached Paragraph 8(d) of the RPA, as well as its fiduciary obligations to Adirondack.

**D.** **Adirondack's Ticket Sales After The Second Amendment**

48.     In 1999 when GLI proposed the conversion to TRIPS and GLI ticket stock, its proposal extended only to sales made at the Adirondack-operated ticket counters at physical locations along the Pooled Routes.  By its express terms, the reach of the Second Amendment was likewise limited to sales from Adirondack-operated ticket counters at certain physical locations along the Pooled Routes.  At the time, Adirondack had other outlets for the sale of Pool tickets, to which the proposal did not extend.  At no time during the negotiation or implementation of the Second Amendment did GLI request that those other sales outlets be converted to TRIPS and to printing tickets on GLI ticket stock.

49.     With GLI's knowledge, Adirondack continued selling all of its tickets—including tickets for Pool travel—through all of its other outlets, as it had always done.  As had always been the case, those sales were made through Adirondack's own ticket-selling system and on Adirondack ticket stock.  Unlike the tickets Adirondack sold through TRIPS, these sales were not made pursuant to a license agreement with GLI, and GLI therefore did not pay Adirondack a license agreement selling commission on the sales.

50.     When Adirondack sells a ticket for Pool travel, GLI (as the Pool's accountant) receives the redeemed ticket in a Pool trip envelope at its accounting center in Dallas, Texas.  A number of those tickets are printed on Adirondack ticket stock.  Those are the tickets not covered by the Second Amendment to the RPA.  GLI segregates the tickets printed on Adirondack ticket stock, and it submits the tickets to the National Bus Traffic Association ("NBTA") to reclaim the ticket values.  The NBTA then pays Adirondack a commission.  That commission rate has changed over time, but it approximates 20% of the value of the ticket.  A similar process occurs when the Pool honors a ticket sold by a company other than

17

Adirondack or GLI:  GLI receives the ticket, submits it to the NBTA for reclaim, and the NBTA pays the selling entity a commission of approximately 20%.

51.     In or around 2004, GLI contended that Adirondack was not entitled to receive the full NBTA commission (of approximately 20%) on tickets sold on Adirondack ticket stock for Pool travel.  Adirondack believed that it had every right to continue to sell those tickets and receive the NBTA commission.  GLI proposed as a compromise that the NBTA commission Adirondack received on tickets for Pool travel be adjusted from the NBTA rate of approximately 20%, down to a rate (referred to as the "cost-to-sell rate," which is discussed below) that Adirondack was paying GLI for selling tickets.  Thus, under the compromise, GLI and Adirondack would pay each other the same percentage to sell tickets for Pool travel.  Adirondack agreed to GLI's proposal, and GLI created an accounting mechanism to make that adjustment in the monthly Pool settlement reports.

52.     Since that time, the parties have performed as agreed in 2004.  Adirondack has continued to sell tickets for Pool travel through all outlets not governed by the Second Amendment, on Adirondack's ticket selling system and printed on Adirondack ticket stock.  GLI has reclaimed those tickets through the NBTA, the NBTA has credited Adirondack with a commission approximating 20%, and in the monthly Pool settlement agreements, GLI has adjusted that 20% commission down to the then-in-place Pool cost-to-sell rate.

53.     When Adirondack began selling tickets on the Internet in approximately 2008, those sales were made in accordance with this agreement.  Since those sales began in approximately 2008, Adirondack has consistently sold tickets for Pool travel over the internet using its ticket-selling software and on Adirondack ticket stock.  GLI knew of, and consented to, those sales.  GLI encouraged those sales, as a mechanism to combat the recent entry of a

competitor, Megabus, into the market between Toronto and New York.  In fact, GLI testified before Canadian regulators in 2010, and displayed Adirondack's website during its testimony to demonstrate the convenience of web purchases of Pool tickets.

54.     Now, GLI wrongfully contends that Adirondack is not entitled to receive those commissions.  It has demanded that Adirondack refund commissions that GLI calculated as the Pool's accountant and paid to Adirondack.  GLI also has insisted that Adirondack is no longer entitled to receive commissions for tickets it sells going forward.

**E.     <u>Cost-to-Sell Rate</u>**

55.     Due to changes put in place through the Second Amendment, GLI began incurring more of the costs associated with the sale of Pool tickets.  Shortly after implementation of the Second Amendment, GLI communicated this concern to Adirondack. GLI proposed that Adirondack begin paying a percentage of its share of Gross Pool Revenues to GLI, as a "cost-to-sell" to reimburse GLI for those selling costs.

56.     GLI presented the costs it proposed to include in the cost-to-sell rate. Adirondack insisted that only in-terminal selling costs be included and that operational and back-office costs must be excluded.  After going through GLI's in-terminal selling costs, Adirondack agreed to pay GLI a negotiated rate of 12.5% of Adirondack's Gross Pool Revenues, to reimburse GLI for its selling costs.  This is referred to as the "cost-to-sell rate".

57.     As discussed above, shortly thereafter the parties also agreed that the same cost-to-sell rate would be used as the commission rate to be paid to Adirondack for tickets it sold on Adirondack paper for Pool travel.

58.     Thereafter, the parties have negotiated adjustments to the cost-to-sell rate. Each time, the parties reviewed GLI's proposed costs and negotiated an agreed rate.  Each

19

time they changed the cost-to-sell rate, they adjusted the commission rate for tickets on Adirondack paper for Pool travel, to equal the cost-to-sell rate.  In this way, they continued to perform as agreed in 2004, by adjusting the commission rate paid to Adirondack on those tickets down to the then-in-place Pool cost-to-sale rate that GLI was being paid on Pool ticket sales.

59.     The last cost-to-sell rate negotiated and agreed between the parties was for the year 2007, and it is a rate of 15.01%.  That rate has been in place ever since.

60.     For many years after 2007, GLI did not request any adjustment to the 15.01% rate.  Then, in 2012, GLI proposed changing the methodology from a "cost-to-sell rate" to a "cost-to-operate rate."  The "cost-to-operate" proposal included many GLI operational costs that Adirondack had refused to include in the cost-to-sell methodology.  The cost-to-operate was also contrary to the premise of the RPA that the parties pool revenues but each bears its own operational costs.  On information and belief, through this proposed change, GLI was trying to shift more of its operational costs onto Adirondack.

61.     Although Adirondack was willing to consider including internet selling costs in the methodology, it refused to include operational costs.  GLI would not substantiate its costs and continued to insist on including operational costs.  The parties were unable to reach an agreement to change the methodology.

62.     Thereafter, GLI demanded to change the cost-to-sell rate retroactively to 2008.  It contends that Adirondack owes several million dollars for the cost-to-sell for years when GLI never sought a change in the rate.  GLI has refused to substantiate its costs, and many of the costs it seeks to include are operational costs unrelated to selling Pool tickets.

GLI is not entitled to adjust the cost-to-sell rate unilaterally, and it must substantiate that all of the costs it seeks to include are properly costs to sell Pool tickets.

F.        **Defendants' RPA Mileage Deficit between 2011 and 2013**

63.        In the monthly Pool settlements, the parties balance both revenue miles and equipment miles.  Revenue miles are miles a company operates by providing both the bus and the driver.  Equipment miles are miles a company operates by providing the bus only, while another other company provides the driver and is responsible for the schedule.  In essence, an equipment mile is when one company borrows a bus from the other, and those miles count as revenue miles by the company operating the bus.

64.        The RPA requires each Pool partner to operate a pre-negotiated percentage annually of the revenue miles operated by the revenue Pool.  (See Exhibit 1 at ¶ 3(d))  GLI must operate 59.25% of the Pool's revenue miles, and Adirondack must operate 40.75%.

65.        To effectuate this balance of miles, Adirondack and GLI negotiate three times each year to agree which Pool partner will operate which Pool schedules for the upcoming season. For purposes of schedule allocation, the 12-month year is broken into three seasons: a fall season, a winter/spring season, and a summer season.  These schedule allocation decisions require consideration of many factors.  From the beginning of the Pool in 1997 until the schedule negotiations for the fall of 2013, GLI and Adirondack always reached mutual agreement on the schedule allocations.  Those agreements are themselves contracts, and the partner allocated a schedule under those agreements bears responsibility for operating the schedule's regular sections and any extra sections.

66.        When a party operates a regularly scheduled bus, the miles are referred to as "regular miles" or "revenue miles."  Often, one or more additional buses are necessary to

serve the passengers for a particular trip, and those extra buses are referred to as "extra sections."  The miles to operate an extra section are called "extra section miles."

67.     Regular miles are more predictable and less costly to operate than extra section miles.  Regular trips are typically scheduled so the bus operates a round trip, thus carrying fare-paying passengers in both directions.  In contrast, extra sections typically require operating a bus empty (called "deadheading"), either to position the bus prior to the trip or to return it after the trip.  As a result, an extra section usually does not generate additional revenue for the miles operated to position the bus, and thus extra sections are more costly to operate than regular miles.

68.     When the parties established the schedules, they aimed to balance overall miles, while also balancing both regular and extra section miles.

69.     The schedule allocations involve a mathematical exercise, and when operating the allocated schedules, the Pool partners have historically been able to operate approximately the mileage expectations they had when agreeing to the allocations.  However, in recognition that the operational implementation of the agreed schedule allocations is not an exact science, the Pool partners agreed in the RPA that a party incurring a mileage imbalance will increase its operations so as to eliminate the shortfall within ninety days. (Exhibit 1 ¶ 3(f))  When imbalances arose, the Pool partners designed the next season's schedule to allow the party with the shortfall the opportunity to make up the imbalance.  That process worked well to correct imbalances for almost 15 years of the Pool.

70.     That changed in 2011.  GLI began accruing a mileage deficit in the fall of 2011. As they had always done, the Pool parties made schedule adjustments that should have allowed GLI to work off the imbalance quickly.  However, GLI's inability to execute the

plan prevented it from working down the imbalance. GLI lacked resources – including in-position and available buses and drivers – to perform its obligations during busy travel periods, and GLI regularly called on Adirondack for help on GLI schedules that GLI lacked the resources to serve.

71.     The imbalance arose because GLI downsized its fleet by 45% between 2005 and 2011, and it had to park 250 additional buses when the Americans with Disabilities Act became effective for intercity bus companies in 2012.  As a result of its smaller fleet, GLI routinely needed Adirondack to cover for it.  The deficit continued to grow in spite of schedules the Pool partners agreed to in 2011, 2012, and well into 2013, which were designed to allow GLI to work off the deficit.  GLI kept assuring Adirondack that it was expecting approval to obtain additional equipment and would work off the imbalance in 2012.  GLI failed to do so, and the imbalance continued to grow.  Regardless of the cause, GLI breached the Pooling Agreement by failing to operate the agreed schedules and mileage.

72.     GLC contributed to the imbalance.  GLC regularly borrowed Adirondack buses, in exchange for payment to Adirondack of a per-mile rate.  As noted previously, miles such as these, which one company operates with equipment borrowed from another company, are called "equipment miles".  At one time, the GLC equipment mile calculations and the resulting payments to Adirondack were made pursuant to separate agreements between GLC and Adirondack, known as the Through Services Agreements.  The Through Services Agreements were executed in or before 1994, prior to execution of the RPA.

73.     After operations began under the RPA, GLI and Adirondack kept a separate tally of equipment miles exchanged between GLI and Adirondack through the operations of the Pool, and they incorporated those miles into the monthly RPA settlement process.

23

74.     In or about 2012, GLI, GLC and Adirondack agreed that GLI would begin combining the GLC equipment miles with the GLI equipment miles as part of the monthly RPA settlement process.  That is how the GLC miles have been handled since that time. Through that agreement, the parties agreed to replace the per-mile rate initially agreed to between GLC and Adirondack with the rate used in the RPA settlement process.

75.     Between August 2011 and August 31, 2013, GLI accrued a mileage imbalance of 104,534 revenue miles and GLI/GLC accrued a commingled mileage imbalance of 154,675 equipment miles.

76.     By letter dated July 26, 2013, GLI made a written offer to settle the mileage deficit "unconditionally".  A copy of that letter is submitted as Exhibit 7.  Adirondack accepted the offer.  The parties agreed that GLI would pay Adirondack $412,448.78 to settle the imbalance of 104,534 revenue miles and 154,675 equipment miles accrued by GLI and GLC.  But GLI never paid, in breach of the agreement.

77.     The parties contracted for GLI to pay $412,448.78 to eliminate the imbalance of 104,534 revenue miles and 154,675 equipment miles.   GLI breached that contract. Adirondack is entitled to payment of $412,448.78, plus 18% interest from October 2013 until the date of payment. (Exhibit 1 ¶ 17(c) (interest rate when amount is "not in dispute"))

78.     If the settlement agreement is not enforced, GLI should pay Adirondack's actual costs per mile for compensating for GLI's and GLC's shortfalls from August 2011 to August 2013. Adirondack incurred costs of $452,706.00 to operate the extra miles, and it paid an additional $455,000.00 to retrofit buses to provide the needed additional capacity, for a total of $907,706.

79.     Since August 31, 2013, GLI has operated extra miles over Adirondack's objections.  GLI insisted on operating those miles to try to work off the mileage imbalance that had already been settled by agreement, but for which GLI refused to pay.  In the process, GLI charged Adirondack more than $206,064 in temporary mileage imbalance payments through the Monthly Pool Settlements.

80.     Since the settlement agreement in August 2013, Defendants' equipment mileage deficit has continued to grow.  Defendants refuse to pay for that mileage imbalance. Defendants should be ordered to pay for those miles at the agreed equipment mileage rate of $2.60.  These equipment miles include miles for Adirondack equipment operated by GLC in Canada and GLI in the United States.   The Canadian miles operated by GLC were commingled with GLI's miles in the Pool and, by agreement, are paid at the Pool rate. Defendants have breached the parties' agreement and the RPA by refusing to pay Adirondack for those equipment miles.

81.     GLI also breached the Pooling Agreement by operating too few section miles in 2013 and 2014.

82.     Beginning with the September 2013 schedule, GLI imposed schedules over Adirondack's objection. Those schedules allocated to GLI more than its share of less costly regular miles, while allocating to Adirondack more than its share of higher cost section miles. In doing so, GLI breached not only Paragraph 3(d) of the RPA, but also a specific agreement reached between Mr. Leach (CEO of GLI) and Mr. Berardi (president of Adirondack) in September 2013 that "[g]oing forward, we will build the schedules so that Greyhound and Adirondack each run regular miles in proportion to its respective pool percentage and section

miles in proportion to its respective pool percentage."  That agreement was memorialized in a contemporaneous email between the two, submitted as Exhibit 12.

83.     GLI operated too few section miles in 2013 and 2014, compared against its percentage of Pool mile responsibility under the RPA.  Since the settlement agreement, GLI has accrued a deficit of more than 172,553 extra section miles, and that figure would be even higher if GLI's improper non-revenue miles (described below) were removed.  GLI's breach has damaged Adirondack in the amount of $5.46 per mile for each of those extra section miles for the costs Adirondack incurred to operate those extra sections, totaling at least $372,749.26.

**G.     Defendants Terminate Through Services Agreement**

84.     With a letter sent on December 13, 2013, on "behalf of Greyhound Canada Transportation ULC, a division of FirstGroup America, Inc." Defendants provided Adirondack notice of the cancellation of the Through Services Agreements.  This letter came one week after Adirondack filed for arbitration against GLI.  The cancellation was in retaliation for Adirondack's filing for arbitration.  When the termination became effective one year later, Defendants cancelled GLC trips to and from Toronto that connect in Buffalo with Pool schedules operated by Adirondack.  Those cancelled trips were profitable.  The cancelled trips reduced the convenience and options provided to Pool customers traveling between New York and Canada via the Pool.  Upon information and belief, Defendants actions were intended to shift customers traveling between Toronto and the Pool from Adirondack's schedules to Defendants' schedules.

**H.     GLI has Charged Non-Revenue Miles to the Revenue Pool**

85.     Paragraph 3(d) of the Pooling Agreement requires the Pool partners to operate their assigned percentages of miles over the Pooled Routes. (Exhibit 1 ¶ 3(d)) It also requires the Pool partners to "maintain records" of the miles operated and "report the mileage to the other party in writing within thirty (30) days of the end of each month." (Id. ¶ 3(e)) If the mileage is imbalanced, then the party with too few miles pays a stated rate for the mileage imbalance in the Monthly Pool Settlement and must also work off the imbalance in the future. (Id. ¶ 3(f))

86.     Only "live miles" may be charged to the Pool.  A "live mile" is also called a "revenue mile" and is a mile that is generating additional revenue for the Pool.  Non-revenue miles are deadhead miles.  Deadhead miles cannot be charged to the Pool.

87.     In or around the summer of 2013, Adirondack discovered that GLI was charging non-revenue miles to the Pool.  When it needed to position an additional bus, GLI did not deadhead the bus to the point where it was needed.  Instead, it loaded the passengers on two buses and charged all of the miles to the Pool, even for the portion of a trip where the second bus was not necessary.  For example, on a trip from Montreal to New York City, the passenger load might require only one bus from Montreal to Albany but would require a second bus starting in Albany.  Rather than deadhead the second bus from Montreal to Albany, it loaded passengers on the second bus and charged those miles to the Pool.  For that portion of the trip, the second bus is not generating additional revenue for the Pool because the passengers could be accommodated on a single bus.  However, GLI charged those non-revenue miles to the Pool.  In that way, it improperly shifted operating costs for deadheading a bus to Adirondack, in breach of the RPA.

27

88.     Adirondack could not reasonably have discovered that GLI was charging non-revenue miles to the Pool before the summer of 2013.  GLI maintains the records for its trips, passenger counts and mileage, and it did not provide Adirondack sufficient access to those records for Adirondack to have discovered GLI's practice.

89.     Adirondack's President, Mr. Berardi, raised the issue with GLI numerous times and asked GLI to explain, but GLI did not provide adequate responses.  Adirondack initiated an audit of GLI's mileage under Paragraph 8(d) of the RPA.

90.     The audit revealed the previously unknown breadth of GLI's improper attribution of non-revenue miles to the Pool.  GLI provided 27 months of miles-related data in the audit, and it terminated the audit when Adirondack requested data from earlier periods.

91.     Adirondack estimates that GLI improperly charged more than $5 million in non-revenue miles to Adirondack through the Pool accounting.

**I.      GLI Is Changing Its Business Model to Restricted Capacity**

92.     The Pool was built upon a flexible-capacity business model.  Under a flexible-capacity model, bus carriers serve all customers who want to travel on a particular schedule. The bus carriers do not restrict the capacity (*i.e.*, the number of seats) on a particular schedule, and they provide enough buses to carry all of the customers who want to travel on that schedule.  Adirondack's non-Pool network in this district and the rest of New York continues to operate under a flexible-capacity business model.

93.     Since 2012, GLI and GLC have moved much of their network to a restricted capacity business model, referred to as a managed-capacity model.  Under that model, a bus carrier restricts the number of tickets sold on a given schedule.

28

94.     The Pool continues to operate under a flexible-capacity business model. However, GLI periodically "locks down" Pool schedules, by turning off sales on particular schedules.  This should never happen under a flexible capacity model.  To avoid this under a flexible capacity model, the bus carrier should forecast demand and plan appropriately to ensure that it has enough resources and back-up resources to transport all customers.

95.     Upon information and belief, so-called "walk-up passengers", who purchase tickets at the bus terminal on the day of departure, currently comprise approximately 50% of the Pool's customer base.  Those passengers are less likely to get a seat on their preferred schedule under a restricted capacity model than a flexible capacity model.  If those customers are unable to travel on their preferred schedules, they are more likely to use other competing transportation in the future.

96.     Adirondack believes that with proper planning and devotion of adequate resources to its customers, a bus carrier can operate a successful flexible capacity model, while maximizing the customers' flexibility to choose (and make last-minute changes to their choices) of when to travel.  In any event, neither Pool partner can change the business model of the Pool without the other partner's consent.

## VI.    CAUSES OF ACTION

**A.**     **First Cause of Action: Breach of Contract**

97.     Adirondack adopts by reference Paragraphs 1 through 96 of this Complaint as though set forth in full here.

98.     GLI has breached the RPA and subsequent agreements by excluding from Gross Pool Revenue the amounts it receives from Pool tickets not redeemed for travel.  This

breach has damaged Adirondack by depriving it of an amount estimated to be at least $4,000,000 since 2008 in Adirondack's share of Pool revenue that GLI has kept for itself.

99.     GLI has breached the RPA and subsequent agreements by excluding from Gross Pool Revenue the amounts it receives from fees it has collected from Pool customers in connection with the sale of tickets for Pool travel. This breach has damaged Adirondack by depriving it of an amount estimated to be at least $2,500,000 since 2008 in Adirondack's share of Pool revenue that GLI has kept for itself.

100.    GLI and GLC breached the 2013 Agreement with Adirondack to settle the revenue mile and equipment mile deficit. This breach damaged Adirondack by depriving it of the agreed payment of $412,449. In the alternative, the underlying mileage imbalance GLI and GLC accrued between August 2011 and August 2013, in breach of the RPA and the agreed-to schedule allocations between the Pool partners, damaged Adirondack in the amount of Adirondack's actual costs of operating the miles in excess of its contractual obligation— $452,706—plus $455,000 in expenses Adirondack incurred to retrofit excess buses to be ADA-compatible so that it could compensate for GLI's shortcomings. In addition, since the settlement date of August 31, 2013, GLI has operated extra miles over Adirondack's objections. In the process, GLI charged Adirondack more than $206,064 in temporary mileage imbalance payments through the Monthly Pool Settlements, which GLI should be ordered to return to Adirondack. GLI and GLC have also allowed the equipment mile imbalance to continue to grow since the August 31, 2013 settlement. At the agreed-upon rate of $2.60 per mile, GLI and GLC have damaged Adirondack for this growing imbalance.

101.    GLI breached the RPA and the agreement reached between Adirondack and GLI in September 2013 to build balanced schedules, by imposing schedules on Adirondack beginning with the fall 2013 schedule that forced a disproportionate share of more costly extra section miles on Adirondack and allocated to GLI a disproportionate share of less costly regular miles.  That breach caused Adirondack damages in an amount estimated to exceed $370,000 in costs to operate those miles.

102.    GLI breached the RPA by charging non-revenue miles to the revenue Pool, and thereby receiving credit for revenue miles that it did not operate.  This breach has damaged Adirondack in an amount estimated to exceed $5,000,000.

103.    GLI has breached the RPA by refusing to comply with Paragraph 8(d) of the RPA, authorizing Adirondack to access all books and records maintained by GLI related to the RPA, upon request but no less than quarterly.  When Adirondack exercised its rights under Paragraph 8(d) through a formal request, GLI first stalled and then completely terminated Adirondack's access to the requested information.  This breach has damaged Adirondack by depriving it of access to its own financial information regarding Pool performance and statistics.

104.    As a result of Defendants' breaches of the RPA and of the 2013 contract to settle GLI's and GLC's mileage imbalances, Plaintiff has been required to seek the services of the undersigned attorneys.  On numerous dates including December 5, 2013, October 21, 2014, and November 10, 2014, Plaintiff's attorney presented Defendant or Defendant's attorney with a written request for payment of Plaintiff's claims.  It has been more than 30 days since Plaintiff's November 10, 2014 statement of claim was presented to Defendants' attorney.  Therefore, Plaintiff seeks reasonable attorney's fees and costs in addition to the

amount owed under the contracts pursuant to Sections 38.001 et seq. of the Texas Civil Practice and Remedies Code.

**B.**     **Second Cause of Action: Breach of Fiduciary Duties**

105.     Adirondack adopts by reference Paragraphs 1 through 104 of this Complaint as though set forth in full here.

106.     GLI is Adirondack's fiduciary for purposes of calculating and distributing the Pool revenue and calculating and reporting GLI's Pool mileage totals.  GLI owes Adirondack fiduciary duties including duties of care, loyalty, good faith, fair dealing, honest performance, strict accountability, and full disclosure.

107.     GLI breached its fiduciary duties to Adirondack by excluding revenue from unredeemed tickets from its calculation of Gross Pool Revenue, and refusing, delaying, and rebuffing Adirondack's repeated requests that unredeemed ticket revenue be calculated and distributed as part of Gross Pool Revenue. GLI breached its fiduciary duties to Adirondack by incorrectly representing to Adirondack that revenue from unredeemed tickets was immaterial or zero, when GLI knew that was untrue or lacked adequate basis to believe that was true.

108.     GLI breached its fiduciary duties to Adirondack by imposing new and increased fees on Pool customers without Adirondack's consent, by excluding that revenue from its calculation of Gross Pool Revenue, and by refusing, delaying, and rebuffing Adirondack's requests that fee revenue be calculated and distributed as part of Gross Pool Revenue.

109.     GLI breached its fiduciary duties to Adirondack by surreptitiously charging non-revenue miles to the Pool, disguised as extra section miles, and by refusing to cooperate with Adirondack's efforts to determine the scope of the problem and a uniform solution to it.

110.     GLI breached its fiduciary duties to Adirondack by refusing Adirondack's repeated requests for information regarding the Pool's books and records, and details regarding its performance, and by ultimately terminating the formal audit to try to hide from Adirondack the Pool financial information to which Adirondack is entitled.  These acts were done maliciously by GLI, and the harm described above, with respect to which Plaintiff Adirondack seeks recovery, resulted from Defendants' malice.  Plaintiff therefore seeks exemplary damages under Section 41.003 of the Texas Civil Practice and Remedies Code.

111.     Since in or about 2000, Adirondack has paid GLI more than $5,000,000 in an administrative fee for performing as Adirondack's fiduciary in providing accounting services and recordkeeping for the Pool.  Because of GLI's above-described breaches of these fiduciary duties, GLI should be ordered to forfeit the amounts it has received from Adirondack through the administrative fee.

112.     GLI breached its fiduciary duties to Adirondack and to the Pool by terminating the Through-Service Agreements between the Adirondack companies and GLC, on December 13, 2013.  GLI (acting through its sister entity, GLC) terminated those agreements in retaliation for Adirondack's December 5, 2013 filing of arbitration.  GLI terminated those agreements with malice toward Adirondack, to the detriment of the Pool and Adirondack, and with the specific intent of causing substantial injury or harm to Adirondack and the Pool.  The termination of the Through-Service Agreements has resulted in a shifting of substantial numbers of passengers each year between Toronto and New York

33

State, away from Adirondack.  GLI terminated those agreements with the specific intent of terminating the Pool and, after termination of the Pool, keeping those yearly revenues for itself, to Adirondack's detriment.   In addition, the termination reduced the number of buses offered by Defendants between Toronto and Buffalo as part of their move to managed capacity, which has had the effect of reducing the number of passengers traveling in the Pool between Buffalo and New York City.  These acts were done maliciously by Defendants GLI and GLC, and the harm described above, with respect to which Plaintiff Adirondack seeks recovery, resulted from Defendants' malice.  Plaintiff therefore seeks exemplary damages under Section 41.003 of the Texas Civil Practice and Remedies Code.

**C.      Third Cause of Action: Fraud**

113.      Adirondack adopts by reference Paragraphs 1 through 112 of this Complaint as though set forth in full here.

114.      Adirondack asserts a cause of action for actual and constructive fraud by GLI for GLI's failure and refusal to correctly report Gross Pool Revenue—to include revenue from unredeemed tickets—to Adirondack.  GLI also defrauded Adirondack by repeatedly assuring Adirondack that the revenue from unredeemed tickets was immaterial, with the intent that Adirondack rely on that material representation, when GLI either knew that to be false or asserted it recklessly without knowledge of its truth.

115.      Adirondack asserts a cause of action for actual and constructive fraud by GLI for GLI's failure and refusal to correctly report Gross Pool Revenue—to include revenue from fees—to Adirondack.  GLI charged new and increasing fees to Pool customers and failed to disclose those charges to Adirondack or to report them as part of Gross Pool Revenue.

116.     Adirondack asserts a cause of action for actual and constructive fraud by GLI for GLI's failure and refusal to correctly report its Pool miles to Adirondack.  GLI charged non-revenue miles to the Pool, disguised as revenue miles.

117.     GLI's fraudulent concealment through the acts and omissions described above, to include termination of Adirondack's inquiry under Paragraph 8(d) of the RPA, constitutes fraudulent concealment and tolls the statute of limitations on Adirondack's claims.

118.     The harm caused by Defendant GLI as described in this Complaint was the result of fraud. Plaintiff Adirondack therefore seeks exemplary damages under Section 41.003 of the Texas Civil Practice and Remedies Code.

**D.      Fourth Cause of Action: Negligent Misrepresentation**

119.     Adirondack adopts by reference Paragraphs 1 through 118 of this Complaint as though set forth in full here.

120.     Pleading in the alternative to Paragraphs 98 through 99 and 102 through 103, and to Paragraphs 114 through 118, Adirondack respectfully asserts a cause of action for negligent misrepresentation.

121.     GLI has a duty to properly account for the Pool revenue through the Monthly Pool Settlement reporting process, and it has a duty to correctly respond to Adirondack's inquiries about the Pool.  GLI has breached its duty to correctly report the Pool's financial information and to respond to Adirondack's inquiries.  To further its scheme to misrepresent the Pool revenues, it terminated Adirondack's audit into mileage and revenues attributed to the Pool.

35

122.     GLI misrepresented Pool revenue to Adirondack by withholding information regarding revenue from fees and revenue from unredeemed tickets.  GLI misrepresented its Pool revenue miles by inflating its mileage total to include non-revenue miles.

**E.     Fifth Cause of Action: Declaratory Judgment Construing the RPA**

123.     Adirondack adopts by reference Paragraphs 1 through 122 of this Complaint as though set forth in full here.

124.     An actual controversy exists as to the rights of the Parties under the RPA. Adirondack requests the following declarations:

a.     That unredeemed ticket revenue should be included in Gross Pool Revenue and that GLI must account for unredeemed ticket revenue going forward; and

b.     That fees charged by GLI for Pool tickets are Gross Pool Revenue and that GLI must account for those fees going forward; and

c.     That GLI may not charge non-revenue miles to the revenue Pool, thereby shifting its operational costs onto Adirondack; and

d.     That the RPA requires the parties to adopt schedule allocations that reasonably are expected to balance both regular and extra section miles; and

e.     That GLI has breached its duties as the accountant for the Pool under Paragraph 8(d) of the RPA by refusing to provide Adirondack access to "all books and records . . . maintained by GLI relating to" the RPA "at [Adirondack's] request, but not less than quarterly."

f.     That Adirondack is entitled to continue receiving commissions (as adjusted by GLI down to the cost-to-sell rate) for its sales of internet tickets for Pool travel;

g.     That neither party may unilaterally impose a new business model on the Pool; and

h.     That neither party may unilaterally change the cost-to-sell rate that Adirondack pays to GLI on Adirondack's Gross Pool Revenue.

125.     Plaintiff accordingly seeks a declaratory judgment construing the RPA pursuant to 28 U.S.C. § 2201.

126.     Plaintiff has retained the undersigned attorneys to represent Plaintiff in this proceeding and/or in the arbitration that was conducted as a condition precedent to initiating this proceeding.  Plaintiff has agreed to pay to its attorneys their reasonable and necessary fees. An award of reasonable and necessary costs and attorney's fees to plaintiff would be equitable and just, and is therefore requested and authorized under Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

**F.     Sixth Cause of Action: Payment of Equipment Miles Under the Through Services Agreement**

127.     In the alternative to the portion of Paragraph 100 seeking recovery through the Pool accounting process for the equipment mile deficit accrued by GLC, Adirondack asserts a cause of action for payment of those miles under the Through Services Agreement.

**VII.   Demand For Trial By Jury**

128.     Plaintiff Adirondack hereby demands a trial by jury.

**VIII.   Relief Requested**

129.     Therefore, Plaintiff Adirondack respectfully requests that the Court grant relief as follows:

a.     Damages in excess of $17,000,000, in an amount to be determined at trial;[3]

b.     A declaration construing the RPA and determining that:

1)     Revenue from unredeemed tickets must be included in Gross Pool Revenue;

2)     Revenue from fees must be included in Gross Pool Revenue;

3)     Non-revenue miles may not be charged against the revenue Pool;

---

[3] Adirondack expressly reserves the right to update its damages request, as its damages are continuously increasing.

4)      One party may not impose an unbalanced Pool schedule allocation without the other party's consent;

5)      GLI must provide Adirondack access to all books and records relating to the Revenue Pooling Agreement—including all information regarding miles, revenues, and terminal expenses—on the reasonable advanced notice of fourteen (14) days;

6)      Adirondack is entitled to continue receiving commissions (as adjusted by GLI down to the cost-to-sell rate) for its sales of internet tickets for Pool travel;

7)      Neither party may unilaterally impose a new business model on the Pool; and

8)      Neither party may unilaterally change the cost-to-sell rate that Adirondack pays to GLI on Adirondack's Gross Pool Revenue;

c.      Injunctive relief ordering transfer of the Pool accounting to an independent accounting firm, and any additional cost over the amount Adirondack is currently paying GLI to perform that function (1.65% of Adirondack's share of Gross Pool Revenues) be paid by GLI;

d.      Exemplary damages, in an amount to be determined;

e.      Costs of this action;

f.      Attorneys' fees and expenses;

g.      Pre- and post-judgment interest as provided by law, to include pre- and post-judgment interest of 18% under Paragraph 17(c) of the RPA on the amount of $412,449; and

h.      An order for any other relief, at law or equity, to which Plaintiff Adirondack is entitled.

October ___, 2015                              Respectfully submitted,

                                              /s/ Justin A. Heller
    Alden L. Atkins                   Justin A. Heller
     NDNY Bar Number: 302649          NDNY Bar Number: 103632
     aatkins@velaw.com               jheller@nolanandheller.com
    Crystal Y'Barbo Stapley           Shannan C. Krasnokutski
     cstapley@velaw.com              NDNY Bar Number: 512932
    Vinson & Elkins LLP               skrasnokutski@nolanandheller.com
    2200 Pennsylvania Ave. NW, Suite 500 Nolan & Heller, LLP
    West                             39 North Pearl Street, 3rd Floor
    Washington, DC  20037            Albany, NY  12207
    Telephone: (202) 639-6500        Telephone: (518) 449-3300

                                              *Attorneys for Plaintiffs Adirondack Trailways,*
                                              *Pine Hill Trailways, and New York Trailways*

39

US 2197211v.8