# Exhibit 1

REVENUE POOLING AGREEMENT

THIS AGREEMENT, entered into this ___ day of May, 1997, by and between Adirondack Transit Lines, Inc., d/b/a Adirondack Trailways, and its corporate affiliates, Pine Hill-Kingston Bus Corp., d/b/a Pine Hill Trailways, and Passenger Bus Corporation, d/b/a New York Trailways, New York corporations maintaining their principal office at 411 Washington Avenue, Kingston, New York 12401 (together "ADT"), on the one hand, and, on the other, Greyhound Lines, Inc. a Delaware corporation maintaining it principal office at 15110 North Dallas Parkway, Dallas, Texas 75148, and its wholly owned subsidiary, Vermont Transit Co., Inc., a Vermont corporation maintaining its principal office at 135 St. Paul Street, Burlington, Vermont 05401 (together "GLI").

WITNESSETH:

WHEREAS, ADT and GLI are motor carriers of passengers and express engaged in interstate operations pursuant to grants of authority received from the Interstate Commerce Commission ("ICC"), predecessor of the Federal Highway Administration of the U.S. Department of Transportation ("FHWA"), and grants of authority received from the FHWA, and

WHEREAS, ADT and GLI have competed over certain of their intercity routes, as, for example, between Albany, New York, and New York, New York, and between Buffalo, New York, and New York, New York, with the result that neither of them has sufficient ridership or adequate income in rendering the service, and

WHEREAS, ADT and Greyhound heretofore sought and obtained ICC

and Surface Transportation Board ("STB") approval to pool their services over all of the routes over which the parties seek to pool their revenues as provided herein, and

WHEREAS, ADT and GLI have agreed that, subject to the approval of the STB and in the interest of committing themselves to the furtherance of their joint undertaking, they should pool the earnings derived from their pooled operations, and

WHEREAS, ADT and GLI have agreed that, as a means of more closely coordinating their operations, they should share certain of their terminals,

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual agreements herein, ADT and GLI, intending to be legally bound, covenant and agree, as follows:

1.   Establishment of Pool.

a.   The routes which shall be the subject of this Agreement ("Pooled Routes") are the following routes, including all intermediate points, authorized to be served by ADT and GLI:

(i)   Between Albany, NY, and New York, NY

(ii)   Between Buffalo, NY, and New York, NY

(iii)   Between Buffalo, NY, and Albany, NY

(iv)   Between Albany, NY, and Long Island, NY

[(v)   Between New York, NY, and Montreal, PQ, Canada

These routes are shown as schedules 7100, 7103, 7104, 7105, 7106, 7107, 7112, 7119, 7120 and 7121 of ADT and schedules 152, 170, 172 and 1984 of GLI in the timetables and maps of the January 1997 issue of Russell's Official National Motor Coach Guide, copies of

-2-

which are attached as Exhibit 1.

b.    The revenues which shall be the subject of this Agreement ("Gross Pool Revenue") are gross amounts received by ADT and GLI from the sale of passenger tickets and package express shipments handled, regardless of where or by whom the tickets were sold or the busbills issued, for the transportation of passengers and express in scheduled, intercity bus service over all or any portion of the Pooled Routes, except that in the case of ADT, revenues derived from service to or from intermediate points between Albany, NY, and New York, NY, shall not be included in Gross Pool Revenue if such service does not operate to or via both New York, NY, and Albany, NY, and in the case of GLI, service between Sranton, PA, and Binghampton, NY, shall not be included in Gross Pool Revenue if such service is not operated in connection with a through bus service which operates to, from or via New York, NY.

c.    Revenue from passenger tickets and package express shipments that originate and/or terminate at points beyond the Pooled Routes but which traverse all or any portion of the Pooled Routes, and which does qualify for inclusion in Gross Pool Revenue pursuant to subparagraph b above, will be allocated to the Pooled Routes and included in Gross Pool Revenue on a mileage prorate basis.

2.    Collection of Revenue.

a.    At GLI and ADT terminals or agency stations on the Pooled Routes, passenger tickets or package express busbills will

-3-

be sold on the ticket stock or busbills of GLI or ADT, whichever is the carrier on which the passenger or package express shipment is initially transported, and the gross sales amount received by ADT and GLI for transportation over all or any portion of the Pooled Routes shall be included in Gross Pool Revenue.

b.   If either ADT or GLI honors a ticket or busbill for passenger or express transportation issued by a carrier other than itself or the other party to this Agreement, for transportation over all or any portion of the Pooled Routes, ADT or GLI shall reclaim the ticket or busbill from the issuing carrier, and the net sales amounts due ADT or GLI for transportation over all or any portion of the Pooled Routes shall be included in Gross Pool Revenue.   If either ADT or GLI honors a ticket or busbill for passenger or express transportation issued by the other party to this Agreement, for transportation over all or any portion of the Pooled Routes, ADT or GLI shall not reclaim the ticket or busbill from the other party, and the gross sales amounts due ADT or GLI for transportation over all or any portion of the Pooled Routes shall be included in Gross Pool Revenue, but recorded as an amount due to the party honoring the ticket from the party on whose ticket stock the ticket was issued.

3.   Mileage Operated.

a.   ADT and GLI shall operate the schedules over the Pooled Routes as shown on the attached timetable, Exhibit 2.   The timetable may be revised from time to time, upon the written agreement of the parties.

-4-

b.    Either party may stop its buses at additional intermediate points, provided such service can be rendered without significant delays.

c.    Neither of the parties shall operate any schedules over the Pooled Routes other than as set out in Exhibit 2; however, if necessary, either of the parties may operate additional sections of a schedule, provided, any additional bus departs within thirty (30) minutes of the scheduled departure of the schedule for which it is an additional section.

d.    ADT and GLI shall operate the percentage of the total bus miles (including regular and extra-section miles) annually over all or any portion of the Pooled Routes as contained in Exhibit 3.

e.    Each party shall maintain records of the miles it operates over all or any portion of the Pooled Routes and report the mileage to the other party in writing within thirty (30) days of the end of each month.

f.    On the three (3) month anniversary date of the commencement of operations pursuant to this Agreement and quarterly thereafter, ADT and GLI shall determine whether either of them has operated less than its percentage of the miles during the preceding quarter.  That party experiencing a shortfall shall increase its operations so as to eliminate the shortfall within ninety (90) days of the quarterly review date.  If, by the end of such ninety (90) day period the party experiencing the shortfall has not eliminated the shortfall, then such party shall pay the other party for the additional miles it operated during the quarter, at the rate of

-5-

sixty-five cents ($0.65) per mile without driver and one dollar and ten cents ($1.10) per mile with driver.  Each party shall have the right unilaterally to adjust the mileage rates to reflect seasonal and geographic factors on thirty (30) days' written notice to the other party, and such adjusted rates shall apply prospectively on miles operated after their effective date.    If a party elects unilaterally to adjust its mileage rates, the other party may, at its sole discretion, identically adjust its mileage rates, to be effective on the same date as the other party's mileage rate adjustment, upon written notice to the other party without the requirement of a thirty (30) day advance written notice.

4.    Service Adjustments.

a.    It is of essence that the parties continue to maintain service over the Poled Routes at the same high level of service as exists as of the date of this Agreement.  To assure such continued high level of service, the parties agree that their representatives shall meet on a regular basis, at least once every four (4) months, to review their operations over the Pooled Routes, but either party may request a meeting at any time for cause, which request shall be honored by the other party within a reasonable period of time.    Such review shall include, at a minimum, a discussion of the adequacy of schedules being operated over the Pooled Routes, operation according to schedule, conditions of the terminals along the Pooled Routes and customer service and/or ticketing complaints (if any) regarding service over the Pooled Routes.    The parties shall agree upon any changes in their service

-6-

over the Pooled Routes to safeguard passenger satisfaction, and to foster economic and efficient operations that will preserve the business value of the Pooled Routes.

b. Should the parties' representatives disagree at such meeting about the changes required to maintain acceptably high levels of service, upon written notice by either party to the other, the parties agree that representatives of senior management of the parties shall confer promptly and as often as may be required to attempt to resolve such disagreements.

c. If, after such conference or conferences, one party reasonably concludes that the performance of the other is such that high levels of service are no longer being maintained and are such as to injure the business value of the Pooled Routes and the parties' disagreement is shown to be incapable of being resolved informally, such party may give written notice to the other that the dispute between the parties shall be submitted to binding arbitration under the provisions of paragraph 23 of this Agreement.

5.  Baggage and Express Claims.

ADT and GLI shall investigate and endeavor to settle claims relating to, or arising from, the loss of, or damage to, any baggage or express shipment on the Pooled Routes.  The expenses incurred and sums expended by ADT and GLI in investigating and settling such claims shall be prorated between the parties in accordance with the mileage percentages of subparagraph d of paragraph 3 above, and shall be deducted from each party's share of the Net Pool Revenue, as provided in paragraph 7 below.

-7-

6.   Terminal Expenses.

ADT and GLI shall bear all of the expenses at terminals and
stations on the Pooled Routes that each operates as shown in
Exhibit 4, including any commissions due agents, rents, utilities,
maintenance and other expenses.  ADT shall operate the terminals on
the Pooled Routes at Albany, NY, and Rochester, NY, and will act as
agent for GLI pursuant to the terms and conditions of a Bus
Terminal License Agreement that will be executed between the
parties.  GLI shall operate the terminals on the Pooled Routes at
Buffalo, NY, and Syracuse, NY, and will act as agent for ADT
pursuant to the terms and conditions of a Bus Terminal License
Agreement that will be executed between the parties.  In connection
with those Bus Terminal License Agreements, each party will be
entitled to recover from the other party the portion of Station
Expenses that it incurs as the result of representing the other
party at Albany and Rochester, NY, in the case of ADT, and at
Buffalo and Syracuse, NY, in the case of GLI.   Those Station
Expenses shall be recovered by assessing commission charges based
on a sales weighted proration of operating expenses.  Only those
operating expense accounts contained in Exhibit 5, as may be
renamed or renumbered from time to time, shall be used to calculate
total allocable operating expenses that will be included in the
Station Expenses to be prorated.

7.   Computation of Net Pool Revenue.

a.   Within thirty (30) days after the end of each month
("Current Accounting Month"), ADT and GLI will report to each other

-8-

the total passenger revenue that each realized from operations over the Pooled Routes and the total package express handled at each of their terminals and agencies on the Pooled Routes. The sum of the passenger revenue realized from operations over the Pooled Routes by both parties, and the sum of package express handled at each of the terminals and agencies on the Pooled Routes by both parties shall be Gross Pool Revenue. From the Gross Pool Revenue shall be deducted baggage and express claims expenses.

b. The remainder, after the deduction of the amount of the baggage and express claims expenses, shall be the amount available for distribution to the parties ("Net Pool Revenue"), which shall be distributed as net revenue available from passenger operations ("Net Pool Passenger Revenue") and net revenue available from package express operations ("Net Pool Express Revenue").

8. Distribution of Net Pool Revenue.

a. ADT and GLI shall receive the percentages of Net Pool Passenger Revenue as shown in Exhibit 6.

b. ADT as its share of the Net Pool Express Revenue shall receive a sum equal to the product of multiplying the percentage determined as shown in Exhibit 7, Express Pool Revenue Factor, times the gross amounts received by ADT and GLI for express shipments transported in scheduled, intercity bus service over all or any portion of the Pooled Routes at the terminals and stations listed in Exhibit 4, reduced by baggage and express claims expenses.

c. Based on the reporting procedure contained in

paragraph 7(a) above, if at the end of a month it is determined that either ADT or GLI has retained through passenger ticket sales or interlines passenger ticket reclaims more than its share of Net Pool Passenger Revenue as provided in paragraph 8(a) above, or has retained through package express sales or interline package express reclaims more than its share of Net Pool Express Revenue as proved in paragraph 8(b) above, the party retaining the disproportionate share of either Net Pool Passenger Revenue and/or Net Pool Express Revenue shall remit to the other party, within forty-five (45) days of the end of the Current Accounting Month, the excess amount being held.

d.    At GLI's request, but not less than quarterly, ADT shall make available to a certified public accounting firm designated by GLI or to GLI's company auditors, all books and records maintained by ADT relating to this Agreement at the place where the books and records are maintained and during normal business hours.    Similarly, at ADT's request, but not less than quarterly, GLI shall make available to a certified public accounting firm designated by ADT or to ADT's company auditors, all books and records maintained by GLI relating to this Agreement at the place where the books and records are maintained and during normal business hours.    Any corrections or adjustments claimed by ADT or GLI to previous distributions of Net Pool Revenue as a result of such an audit shall be limited to the two year period immediately preceding the date on which that audit was commenced.

9.    Additional Terminal Costs.

-10-

Except as provided in paragraph 6, subparagraph a of paragraph 7 and subparagraph b of paragraph 8 above, neither ADT nor GLI will be charged with any of the expenses attributable to operations on the Pooled Routes at any terminal or station on the Pooled Routes which is operated by the other.

10.  Operator's Responsibility.

a.  The party controlling the driver ("Operator") of any operations on the Pooled Routes (whether such driver is employed by or is on lease to the party), regardless of the ownership of the bus being operated, shall be exclusively and solely responsible for any and all personal injuries (including death) to third parties and its employees and for any and all property damage occurring or arising from the use and operation of the bus during such time as the Operator's driver has responsibility for control of the bus. The Operator shall indemnify and save harmless the other party from any and all claims, demands, judgments, suits, expenses, including reasonable attorneys' fees, for any and all personal injury (including death) and for any and all damage to property.  In the event a claim is made or a suit is filed against either party for which the Operator has responsibility, the Operator shall be notified of the claim or suit and shall, at Operator's sole cost and expense, investigate, defend and/or settle such claim or suit and pay the amount of the judgment or settlement and any and all costs and expenses, including reasonable attorneys' fees, incurred by a party in the investigation, defense and/or settlement of such claim or suit.

-11-

b.    The Operator shall be responsible for providing or paying for:

(i).    General and automobile liability insurance, including contractual liability insurance, collision insurance and uninsured motorist coverage when required, covering all buses operated by Operator pursuant to this Agreement. Operator's bodily injury and property damage insurance shall be in an amount not less that $10,000,000 per occurrence (subject to any approved self-insurance authorization) and shall name the owner of the bus as an additional insured.   Operator shall furnish the owner of the bus with a copy of the certificate of insurance to evidence coverage in force prior to the execution of and during the term of this Agreement.

(ii).    Any damage to, or loss of, a bus resulting from the negligence or abuse of the Operator, its employees or agents.

(iii).    The expense of inspecting a bus before Operator accepts it.   Absent any written notation to the contrary on the vehicle inspection report required by 49 C.F.R. 396.11, Operator's acceptance of a bus shall be conclusive evidence that the bus was in safe and efficient operating condition and that the Operator expressly waives and releases all claims against the owner of the bus for loss of, or damage to, the bus arising from defects in its mechanical, operating or physical condition.

(iv).    The operation of the bus in accordance with the standards and other requirements of Federal, state or local

-12-

laws, ordinances or regulations, including the orders of any courts, departments or agencies, from the time the Operator takes control of the bus until it relinquishes control to the owner of the bus or its designee. In particular, and without limiting the foregoing, the Operator shall be responsible for compliance with the provisions of 49 C.F.R. 396.11, which require preparation of daily vehicle inspection reports as to any defects or deficiency discovered by, or reported to, the driver which would affect safety of operation of the bus or result in its mechanical breakdown, certification of corrective action taken prior to the next dispatch, and retention and distribution of such documents.

(v).   All loss or damage to the bus, other than damage to, or loss of, the bus caused solely by fire, occurring while under the Operator's control, provided, however, hat any loss of, or damage to, a bus by fire resulting from collision, resulting from a moving incident, or resulting from the Operator's driving the bus with a flat or under inflated tire shall be deemed to be a loss by collision.   Any damage to, or loss of, the bus shall be reported promptly to its owner.   In the event of damage, the owner shall have the option of making any and all repairs necessary to return its bus to serviceable condition or, instead, authorizing the Operator to make such repairs.   In the event the owner of the bus makes the repairs, the Operator shall reimburse the owner for the cost of the repairs.

(vi).   All repairs not covered by subparagraph (v) above and service and preventative maintenance as are necessary to

-13-

assure the safe and efficient operation of the bus, subject to the owner's approval for all repairs, and reimbursement or credit therefor by the owner of the bus in accordance with paragraph 13 of this Agreement.

(vii).   The driver or drivers for the operation of the bus.

(viii).   If a bus becomes unusable for any reason, the Operator shall notify the owner of the bus.  Except for events covered by subparagraph (ii) above, the owner will furnish a replacement vehicle or authorize the use of Operator's bus at the expense of the owner of the disabled bus for up to seven days' time or, at the discretion of the Operator, use of Operator's bus at the expense of the owner of the unusable bus until such time as the owner furnishes a replacement vehicle.

(ix).   Any highway use taxes.

(x).   Workmen's compensation insurance premiums for its employees.

11.   Compliance with Safety Regulations.

Buses and their drivers furnished by a party for operations on the Pooled Routes shall meet the standards and other requirements of all applicable Federal, state or local laws, ordinances or regulations, including the orders of any courts, departments or agencies.

12.   Loss by Fire.

The loss of, or damage to, a bus caused by fire shall be borne

-14-

by its owner, except that any loss of, or damage to, a bus by fire resulting from collision, resulting from a moving incident, or resulting from the Operator's driving the bus with a flat or under inflated tire shall be deemed to be a loss by collision.

13. <u>Responsibility of Owner.</u>

The owner of a bus, when used in operations over all or any part of the Pooled Routes, shall be responsible for providing or paying for:

a.   All maintenance and service performed on its bus, including all supplies required for its servicing.

b.   All licenses and/or permits.

c.   All fuel and oil, including related taxes.

d.   Comprehensive insurance

e.   Except for events covered by Section 10.b.(ii), the furnishing of a replacement bus within seven days after a bus becomes unusable or authorizing the use of Operator's bus at the expense of the owner of the unusable bus for up to seven days pending repair.

f.   Any road calls.

14. <u>Equipment Standards.</u>

The equipment to be operated by both ADT and GLI on the Pooled Routes shall at a minimum meet the quality, age and maintenance and specification requirements as set forth in Exhibit 8.

15. <u>Legal Obligation to Maintain Service.</u>

For the purpose of satisfying each party's legal obligation to

maintain service over its authorized service routes, each party shall be deemed to be conducting operations over its authorized routes insofar as they are Pooled Routes.

16. STB Approval.

The parties acknowledge that the pooling arrangement contemplated by this Agreement is subject to the jurisdiction of the STB. This Agreement shall not become operative unless and until the STB authorizes the parties to enter into this Agreement under the terms of an administratively final decision, which shall impose no restrictions or conditions upon the terms of this Agreement unacceptable to either party.

17. Default.

a. If either party fails to comply with any of the terms of this Agreement, including, but not limited to, the maintenance of service over the Pooled Routes at a high level, as described in paragraphs 3 and 4 of this Agreement, or the computation and distribution of the revenue shares, as described in paragraphs 7 and 8 of this Agreement, that party shall be in default.

b. A party aggrieved by the other party's default shall give written notice of the default, and, if the default shall not have been cured within thirty (30) days' time, the complaining party may elect to invoke the remedies of paragraph 23 of this Agreement.

c. If the default consist of a failure to remit moneys as provided in this Agreement the amounts of which are not in dispute, the non-defaulting party shall be able, without further

process, to invoke its legal and equitable remedies, including the termination of this Agreement, and interest shall accrue from the date when payment was due at a rate equal to the lesser of (i) eighteen percent (18%) per annum or (ii) the highest lawful interest rate.

d. A party's waiver of a default shall not be deemed to constitute a waiver as to other occasions of default.

18. <u>Term.</u>

This Agreement shall be for a term of thirty (30) years from the date of its unconditional approval by the STB, subject to subsequent ratification by the parties and agreement by the parties on the effective date of this Agreement.

19. <u>Successors and Assigns.</u>

a. No party may transfer or assign this Agreement or its interests herein without the prior written consent of the other party, except as provided in this paragraph 19. The parties agree that this prohibition against a transfer or assignment applies not only to voluntary assignments or transfers but also to assignments or transfers by operation of law and all involuntary assignments or transfers. A merger whereby a party to this Agreement is not the surviving party to a merger, the acquisition by any person or "group" (within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "1934 Act")) of the direct or indirect ownership (within the meaning of Rule 13d-3 of the 1934 Act) of at least a majority of a party's voting capital stock except for "Permitted Transactions" or the sale of all or

-17-

substantially all of the assets of a party except for "Permitted Transactions" shall be deemed a transfer or assignment of this Agreement.

  b.  As used herein, a "Permitted Transaction" shall mean: (A) a merger, transfer or asset sale between a party and one of its wholly owned subsidiaries or its direct or indirect parent, so long as there is no effective change of ownership of the party; (B) in the case of GLI, any sale or transfer of capital stock, so long as not more than eighty percent (80%) of such capital stock, that constitutes voting stock, is acquired by any person, entity or "group" (the term "group" shall be as defined in Section 13d-5 of the 1934 Act); and (C) in the case of ADT, the transfer of any capital stock: (i) among or between existing shareholders of the party; or (ii) to one or more persons listed in Exhibit 9 to this Agreement (each a "Person"), or to any trust or custodial account for the sole benefit of such Person(s), or (iii) in accordance with applicable laws of descent and distribution.

  c.  Each party shall notify the other in writing of any proposed or purported assignment or transfer of more than ten percent (10%) of the total voting stock, including any Permitted Transaction.  If the assignment or transfer is other than a Permitted Transaction, this Agreement will remain in full force and effect for a minimum of four (4) months ("Minimum Period") after the effective date of the transfer or assignment, but at any time during or after the Minimum Period, either party may for any reason whatsoever, upon three (3) months' written notice to the other

party, terminate this Agreement.   When assigned as permitted hereunder, included a Permitted Transaction, the Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of each party.

20. Notice.

Notice shall be given in writing, by Federal Express or other courier or by registered or certified mail, return receipt requested, addressed to the party at its principal place of business, as follows:

> For ADT:
>
> Mr. Eugene J. Berardi, Jr.
> President
> Adirondack Transit Lines, Inc., d/b/a Adirondack
>     Trailways
> 411 Washington Avenue
> Kingston, NY  12401-3703
>
> For GLI:
>
> Greyhound Lines, Inc.
> P. O.Box 660362
> Dallas, TX  75266-0362
> Attn.:  Contracts Administration Department
>
> with copy to:
>
> General Counsel
> Greyhound Lines, Inc.
> P. O. Box 660362
> Dallas, TX  75266-0362

21. Force Majeure.

In the event either party is unable to perform its obligation under this Agreement because of labor disturbances, lock-outs, strikes, war, act of the public enemy, riots or civil commotion, act of God or other and similar condition beyond its control, such nonperformance shall be excused for so long as the hindrance to

-19-

performance exists.    The affected party shall give the other written notice of the existence and date of such <u>force</u> <u>majeure</u> condition within ten (10) days of its occurrence.    The party claiming the existence of the <u>force</u> <u>majeure</u> condition also shall notify the other party in writing of the termination of such condition within ten (10) days of its termination.

     22.    <u>Termination of Business</u>.

     a.    In the event either party ceases to do business as a motor carrier of passengers or abandons service over the Pooled Routes, it immediately shall provide written notice to the other party.    Under such circumstances, the other party, at its sole option, may elect (i) to continue under this Agreement, if appropriate, or (ii) to terminate this Agreement immediately upon the earlier of the notice of termination of business or the actual cessation of business by the affected party, or upon such other date as the other party may specify in writing.    The terminating party shall, to the extent that it controls terminal or agency facilities on the Pooled Routes, continue to make those facilities available to the other party.    Upon such termination, the party which has not ceased doing business or abandoned service over the Pooled Routes shall be relieved of all further obligations to the party which has ceased such business.    Termination under this provision does not expunge the obligations of either party under this Agreement which were created prior to the terminating party's ceasing to do business or abandoning service over the Pooled Routes.

-20-

b.   For purposes of this paragraph 22, the cessation of doing business as a motor carrier of passengers or abandoning service on the Pooled Routes is (i) the termination of bus business on the Pooled Routes, (ii) unless occasioned by a force majeure condition, including a strike or other labor disturbance, the reduction in service to such an extent as to impair substantially the party's ability to provide service over the Pooled Routes, which is reasonably expected to continue for at least thirty (30) days or (iii) operation over the Pooled Routes at substantially less than the percentage required by paragraph 3 of this Agreement in any six (6) months with a twelve (12) month period.   If a party abandons service on the Pooled Routes as described in this subparagraph, and such abandonment results in the cancellation of this Agreement, and the abandoning party reestablishes service on the Pooled Routes within two (2) years of abandoning such service, the other party, at its sole discretion, and upon written notification to the abandoning party, may declare this Agreement to again be in full force and effect, and the parties will again be bound by the provisions of this Agreement.

23.   <u>Arbitration.</u>

a.   In the event of a default (that remains uncured by the defaulting party) or a dispute concerning a party's compliance with the terms of this Agreement, the complaining party shall give written notice to the other party, seeking one or more meetings for the purpose of endeavoring to arrive informally to a mutually satisfactory resolution of their disagreement.   The complaining

-21-

party shall furnish with its notice letter whatever evidence and documentation are available to the complaining party to support its contention.

b.    After the efforts of the parties to obtain an informal resolution of their disagreement have proved to be fruitless and further discussions appear to be pointless, the complaining party may elect to seek arbitration of the parties' disagreement by giving written notice thereof to the other party. If the disagreement is not referred to arbitration within thirty (30) days after the conclusion of the informal resolution process, the complaining party shall be deemed to have waived its rights to pursue any other remedies with respect to the dispute, including, but not limited to, the right to pursue its legal and equitable remedies or arbitration hereunder.

c.    The parties hereby select the American Arbitration Association (the "AAA") to conduct the arbitration hereunder. Except as expressly provided herein, all arbitration shall be initiated, conducted and governed by the established rules and procedures of the AAA. All arbitration proceedings will be held in the offices of the AAA in Washington, DC.   All fees and administrative costs of the arbitration proceeding shall be shared equally, and each party shall bear its own attorneys' fees and expenses in connection therewith. The arbitrator shall be entitled to award damages and may invoke equitable and injunctive relief, including, but not limited to, termination of the Agreement or reformation of its terms and conditions, consistent with the

-22-

parties' original intent. The arbitrator, however, shall not have the right to assess punitive or exemplary damages and may not make any ruling, finding or award that does not conform to the basic intent of the parties as expressed by the terms and conditions of this Agreement. The findings of the arbitrator shall be non-binding, unless the parties mutually agree in writing in advance thereof to binding arbitration.

d. Until the completion of the informal resolution and arbitration process, the complaining party will not be entitled to exercise its other legal or equitable remedies. If the parties have agreed to a binding arbitration, the arbitrator's decision shall be final and non-appealable, except as provided in the United States Arbitration Act, 9 U.S.C. 1, et seq. If the arbitration is non-binding, and if: (i) the arbitrator's findings and decision are unacceptable to the complaining party, for any reason, or (ii) the arbitrator's decision is acceptable to the complaining party, but the other party, for any reason, fails to agree or accept the arbitrator's findings and decision as final, the complaining party shall then be entitled to exercise any other of its legal or equitable remedies, as permitted by law, including, but not limited to, the right to terminate this Agreement for material breach thereof, or to pursue the recovery of damages.

24. State Law.

This Agreement shall be construed and enforced in accordance with the laws of Texas.

25.  Advertising Expense Sharing.

The parties agree that except by mutual written consent, the parties will spend not less, individually or collectively, on advertising the Pooled Route service than two percent (2%) of annual sales on the Pooled Routes.  The amount to be spent by each carrier on advertising the Pooled Route service will be in proportion to the percentage of Net Pool Passenger Revenue to which each carrier is entitled as contained in paragraph 8.a. herein.  If either party spends less than its required portion on advertising the Pooled Route service, the party spending less than its required portion will pay the other party an amount equal to the difference between the amount that the deficient party actually spent on Pooled Route advertising and the amount that the deficient party is required to spend pursuant to the provisions of this paragraph 25. Advertising on the Pooled Route may consist of Pool Specific advertising and/or Market Specific advertising.  Pool Specific advertising is advertising which is conducted in the markets that are on the Pooled Routes and which directly advertises the Pooled Route service.  The actual cost of Pool Specific advertising will be credited entirely to the Pooled Routes.  Market Specific advertising is advertising which is conducted in the markets that are on the Pooled Routes but which is general in nature.  The amount of Market Specific advertising that will be credited to the Pooled Routes will be determined by multiplying the ratio of Pooled Route sales made at the involved markets to total sales made at the involved markets, times the amount of Market Specific advertising

-24-

conducted at the involved markets.

26. Concurrent Agreements.

Contemporaneously with the implementation of this Agreement, the parties shall execute and deliver the following documents: GLI Bus Rental Agreement (Bus With Driver); GLI Bus Rental Agreement (Bus Without Driver); ADT Bus Rental Agreement (Bus With Driver): ADT Bus Rental Agreement (Bus Without Driver); Income Lese Agreement (Albany, NY); Bus Terminal License Agreement (Albany, Rochester, Syracuse and Buffalo, NY).

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year herein written.

ADIRONDACK TRANSIT LINES, INC.　　GREYHOUND LINES, INC.

By: _____　　By: _____

Name: _Eugene J. Berardi, Jr._　　Name: _____

Title: _President_____　　Title: _____

PINE HILL-KINGSTON BUS CORP.　　VERMONT TRANSIT CO., INC.

By: _____　　By: _____

Name: _Eugene J. Berardi, Jr._　　Name: _____

Title: _President_____　　Title: _____

conducted at the involved markets.

26.   Concurrent Agreements.

Contemporaneously with the implementation of this Agreement, the parties shall execute and deliver the following documents:   GLI Bus Rental Agreement (Bus With Driver); GLI Bus Rental Agreement (Bus Without Driver); ADT Bus Rental Agreement (Bus With Driver): ADT Bus Rental Agreement (Bus Without Driver); Income Lese Agreement (Albany, NY); Bus Terminal License Agreement (Albany, Rochester, Syracuse and Buffalo, NY).

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year herein written.

ADIRONDACK TRANSIT LINES, INC.          GREYHOUND LINES, INC.

By: _____      By: _____

Name: _____      Name:  Jack W. Haugsland

Title: _____      Title:  Executive Vice President
                                         & Chief Operations Officer

PINE HILL-KINGSTON BUS CORP.             VERMONT TRANSIT CO., INC.

By: _____      By: _____

Name: _____      Name:  Jack W. Haugsland

Title: _____      Title:  Executive Vice President
                                         & Chief Operations Officer

-25-

PASSENGER BUS CORPORATION

By: _Euge J. Ruard, J_

Name:  Eugene J. Berardi, Jr.

Title:  President

**EXHIBIT 1**

CANTON—POTSDAM—MASSENA—GLENS FALLS—TORONTO—
SYRACUSE—GLOVERSVILLE—SCHENECTADY—ALBANY—NEW YORK



NEW YORK—ALBANY—SCHENECTADY—GLOVERSVILLE—SYRACUSE—TORONTO—
GLENS FALLS—MASSENA—POTSDAM—CANTON

## ALBANY—KINGSTON—NEW PALTZ—WHITE PLAINS—FREEPORT—BABYLON



Schedule Number 7103

## NEW ENGLAND—LONG ISLAND



Schedule Number 7104

## UPSTATE NEW YORK—LONG ISLAND



Schedule Number 7105

EXHIBIT 1
Page 4 of 7

## UTICA—ONEONTA—WINDHAM—KINGSTON—FREEPORT



### MONTREAL—NEW YORK CITY

### ALBANY—ISLIP

### BUFFALO—ROCHESTER—WASHINGTON

### WESTERN NEW YORK—LONG ISLAND

TORONTO—BUFFALO—BATAVIA—ROCHESTER—SYRACUSE—NEW YORK
UTICA—ALBANY—BOSTON



NEW YORK—SYRACUSE—ROCHESTER—BATAVIA—BUFFALO—TORONTO
BOSTON—ALBANY—UTICA



Greyhound

1-8-97

— Greyhound Food Service Facilities.

**INDEX MAP TO TABLES**
# Eastern United States

NEW YORK—ALBANY—PLATTSBURGH—MONTREAL
Via New York Thruway and the "Northway"
Via Autoroute New York et la "Northway"



MONTREAL—PLATTSBURGH—ALBANY—NEW YORK
Via New York Thruway and the "Northway"
Via Autoroute New York et la "Northway"



NEW YORK—BINGHAMTON—ROCHESTER



ALBANY—LONG ISLAND



BOSTON—ALBANY—SYRACUSE—BUFFALO—CLEVELAND

**EXHIBIT 2**

## CANTON—POTSDAM—MASSENA—GLENS FALLS—TORONTO— SYRACUSE—GLOVERSVILLE—SCHENECTADY—ALBANY—NEW YORK



## NEW YORK—ALBANY—SCHENECTADY—GLOVERSVILLE—SYRACUSE—TORONTO— GLENS FALLS—MASSENA—POTSDAM—CANTON

## ALBANY—KINGSTON—NEW PALTZ—WHITE PLAINS—FREEPORT—BABYLON

**SCHEDULE NUMBER 7103**

## NEW ENGLAND—LONG ISLAND

**SCHEDULE NUMBER 7104**

## UPSTATE NEW YORK—LONG ISLAND

**SCHEDULE NUMBER 7105**

EXHIBIT 2
Page 3 of 5

### UTICA—ONEONTA—WINDHAM—KINGSTON—FREEPORT



### MONTREAL—NEW YORK CITY



### ALBANY—ISLIP



### BUFFALO—ROCHESTER—WASHINGTON
ELMIRA—WILLIAMSPORT—SCRANTON—HARRISBURG



### WESTERN NEW YORK—LONG ISLAND

**EXHIBIT 2**
Page 4 of 5

TORONTO—BUFFALO—BATAVIA—ROCHESTER—SYRACUSE—NEW YORK
UTICA—ALBANY—BOSTON

READ DOWN



NEW YORK—SYRACUSE—ROCHESTER—BATAVIA—BUFFALO—TORONTO
BOSTON—ALBANY—UTICA

READ DOWN

EXHIBIT 2
Page 5 of 5

## NEW YORK—ALBANY—PLATTSBURGH—MONTREAL
### Via New York Thruway and the "Northway"
### Via Autoroute New York et le "Northway"



## MONTREAL—PLATTSBURGH—ALBANY—NEW YORK
### Via New York Thruway and the "Northway"
### Via Autoroute New York et le "Northway"



## NEW YORK—BINGHAMTON—ROCHESTER



## ALBANY—LONG ISLAND



## BOSTON—ALBANY—SYRACUSE—BUFFALO—CLEVELAND

**EXHIBIT 3**

**EXHIBIT 3**

## BUS MILEAGE PERCENTAGES

|  | POOL MILES | Stuts |
|---|---|---|
| ADIRONDACK/NEW YORK TRAILWAYS | 41.65% | 42.46% |
| GREYHOUND LINES | 68.35% 58.35% | 57.54% |

**EXHIBIT 4**

EXHIBIT 4

## TERMINAL LOCATIONS

RIDGEWOOD, NEW JERSEY

AMSTERDAM, NEW YORK

BATAVIA, NEW YORK

BUFFALO, NEW YORK

FONDA, NEW YORK

GENEVA, NEW YORK

HEMPSTEAD, NEW YORK

ISLIP, NEW YORK

JOHNSTOWN, NEW YORK

MASSAPEQUA, NEW YORK

NANUET, NEW YORK

NEW ROCHELLE, NEW YORK

PLATTSBURGH, NEW YORK

ROCHESTER, NEW YORK

SYRACUSE, NEW YORK

WHITE PLAINS, NEW YORK

STROUDSBURG, PENNSYLVANIA

MONTREAL, QUEBEC

ALBANY, NEW YORK

BABYLON, NEW YORK

BINGHAMTON, NEW YORK

CANANDAIGUA, NEW YORK

FREEPORT, NEW YORK

GLENS FALLS, NEW YORK

HUNTINGTON, NEW YORK

ITHACA, NEW YORK

KINGSTON, NEW YORK

MINEOLA, NEW YORK

NEW PALTZ, NEW YORK

NEW YORK, NEW YORK

QUEENS VILLAGE, NEW YORK

SARATOGA SPRINGS, NEW YORK

UTICA, NEW YORK

SCRANTON, PENNSYLVANIA

LONGUEUIL, QUEBEC

**EXHIBIT 5**

EXHIBIT 5
Page 1 of 2

| ACCOUNT NUMBER | ACCOUNT DESCRIPTION |
|---|---|
| 3200 XX | PASSENGER REVENUE |
| 3400 XX | EXPRESS REVENUE |
| | MISCELLANEOUS STATION REVENUE |
| 3601 01/02 | PARCEL & BAGGAGE STORAGE |
| 3601 03 | TOILET LOCKS |
| 3601 04 | CONCESSION REVENUE |
| 3601 85 | RESTAURANT INCOME |
| 3601 05 | OTHER STATION REVENUE |
| 3601 32 | WESTERN UNION COMMISSIONS |
| 3601 34 | TELEPHONE & TELEGRAPH |
| 5360 02 | RENTAL INCOME - STATION |
| 5370 02 | SUBLEASE INCOME - STATION |
| 3601 45 | INCOME FROM NONMEMBER |
| 3601 46 | INCOME FROM MEMBER COMPANY |
| | COMMISSION EXPENSE |
| 4331 01 | COMMISSION PAID - TICKET SALES |
| 4331 02 | COMMISSION PAID - PACKAGE EXPRESS |
| 4331 05 | COMMISSION PAID - CONCESSIONS |
| 4331 06 | CLOSED |
| 4331 07 | COMMISSION PAID - BONUS PACKAGE EXPRESS |
| 4331 08 | COMMISSION PAID - GPX SOLICITATION |
| 4331 09 | COMMISSION PAID - SELL & REMIT |
| 4331 21 | COMMISSION PAID - EXTENDED HOURS |
| 4391 06 | JSF - TENANT COMMISSION |
| | OTHER DIRECT EXPENSES |
| 4311 XX | TERMINAL SALARIES (EXCLUDING TIC WAGES) |
| 4315 01 | STATION UTILITIES - ELECTRICITY |
| 4315 02 | STATION UTILITIES - HEAT |
| 4315 03 | STATION UTILITIES - WATER |
| 4318 30 | STATION - NIGHT DEPOSIT & ARMORED CAR |
| 4318 31 | STATION - PEST CONTROL |
| 4318 32 | STATION - SIGNS |
| 4318 34 | STATION - GPX SUPPLIES |
| 4318 40 | STATION - ROBBERIES |
| 4318 41 | CLOSED |
| 4318 60 | STATION - EMPLOYEE MEALS |
| 4318 61 | STATION - EMPLOYEE TRANSPORTATION |
| 4318 63 | STATION - AUTO REPAIRS |
| 4318 65 | STATION - MEALS / ENTERTAINMENT |
| 4318 66 | STATION - EMPLOYEE MOVING |
| 4318 67 | STATION - EMPLOYEE HOTEL |
| 4318 68 | STATION - OTHER EMPLOYEE EXPENSE |
| 4318 72 | STATION - GARBAGE & SEWAGE |

EXHIBIT 5
Page 2 of 2

| ACCOUNT NUMBER | ACCOUNT DESCRIPTION |
|---|---|
| 4318 73 | STATION - JANITORIAL SERVICE |
| 4318 74 | STATION - CLEANING SUPPLIES |
| 4318 85 | STATION - FIXTURES & APPLIANCES |
| 4318 89 | STATION - OFFICE EXPENSES |
| 4318 90 | STATION - SECURITY SERVICE |
| 4318 91 | STATION - PHOTOCOPYING |
| 4318 92 | STATION - POSTAGE |
| 4318 95 | STATION - UNIFORMS |
| 4318 97 | STATION - CHECKING SERVICE |
| 4318 99 | STATION - OTHER STATION EXPENSES |
| 4319 76 | STATION - REPAIRS - BUILDING |
| 4332 XX | OTHER EXPENSE ALLOCATION |
| 4391 01 | JOINT STATION FACILITY - DR |
| 4613 XX | ACCOUNTING EMPLOYEES SALARIES * |
| 4640 01 | COMMUNICATION - SERVICE / LINE CHARGES |
| 4640 02 | COMMUNICATION - RECONFIGURE / INSTALL CHARGES |
| 4640 03 | COMMUNICATION - EQUIPMENT LEASE / PURCHASE |
| 4640 04 | COMMUNICATION - EQUIPMENT MAINTENANCE / SERVICE |

OTHER TERMINAL OPERATING EXPENSES

| | |
|---|---|
| 4269 46 | PASSENGER COMPLAINT |
| 4269 52 | OTOE - DELIVER DELAYED |
| 4342 XX | INTERLINE COMMISSION PAID |
| 4351 XX | INTERLINE COMMISSION EARNED |
| 4440 XX | TICKETS, BUSBILLS & BAG CHECKS |
| 4470 02 | DIRECT ADVERTISING EXPENSE |
| 4470 31 | PROMOTION & MARKETING |
| 4470 70 | FRANCHISE ADVERTISING |
| VARIOUS ACCOUNTS | TELEPHONE INFORMATION CENTERS |
| 4640 43 | COMMISSION / DATA - ACS EQUIPMENT |
| 4640 44 | COMMISSION / DATA - ACS EQUIPMENT |
| 4656 43 | OVERAGE AND SHORTAGE |
| 4456 59 | CREDIT CARD DISCOUNT |

FACILITY COSTS

| | |
|---|---|
| 5320 11 | RENT EXPENSE - STATION OPERATION |
| 5320 12 | RENT EXPENSE - STATION CAPITAL LEASE |
| 5011 00 | DEPRECIATION - STRUCTURE OWNED |
| 5051 00 | DEPRECIATION - FURNITURE / OFFICE - TRANS |
| 5061 00 | DEPRECIATION - MISCELLANEOUS |
| 5071 00 | DEPRECIATION - LEASEHOLD IMPROVEMENT |
| 5230 02 | REAL ESTATE TAXES - STATION |

NOTE:  ACCOUNTING EMPLOYEE SALARIES ACCOUNT EQUAL TO 1.5% OF TOTAL ACCOUNT AMOUNT

**EXHIBIT 6**

**EXHIBIT 6**

# NET POOL PASSENGER REVENUE PERCENTAGE

|  | NET POOL PASSENGER REVENUE | Stmts |
|---|---|---|
| ADIRONDACK/NEW YORK TRAILWAYS | 41.82% | 44.33% |
| GREYHOUND LINES | 68.18% 58.18% | 55.67% |

EXHIBIT 7
Page 1 of 2

## DIVISION OF EXPRESS REVENUE

**EXPRESS
Formula:**          (Adirondack Trailways/New York Trailways - "ADT")

1)   The total miles operated by ADT in the proposed pool will be established.

2)   Total net express revenue for the complete ADT system will be established. This will be that express revenue shown on ADT's financial statement (Note: Not to include P & D).

3)   Total miles operated by the complete ADT system will be established.

4)   The system average express revenue per mile will be established by dividing 2) by 3).

5)   The ADT revenue allocated to the pool will be established by multiplying the system average revenue per mile by the miles operated in the pool.
viz 4) x 1).

6)   The total dollar value of express handled, forwarded and received, for all stations designated as pool stations will be established. Pool stations will comprise those stations on the pooled routes operated by ADT and GLI regardless of whether such stations were independently or jointly operated by the pool carriers.

7)   A percentage will be established that indicates what percentage ADT's pool revenue is of the total dollar value of express handled at the pool stations.
viz 5) ÷ 6)
This will be known as the Express Pool Revenue Factor.

EXHIBIT 7
Page 2 of 2

## DIVISION OF EXPRESS REVENUE
### (Continued)

**Application:**  All express revenue and busbills will be reported to GLI, regardless of which carrier in the pool transports the express. Each month the Express Pool Revenue Factor (Item No. 7 above) will be applied to the total dollar value of express handled for all stations allocated to the pool as per Item No. 6 above. The result will be the revenue due ADT for that particular month.

There will be no interline express reclaiming between ADT and GLI for shipments that originate or terminate at stations within the pool, nor for any intermediate (bridge) shipments carried by ADT or GLI in the pool operation. Exception will be when shipments handled within the pool originate or terminate at ADT locations outside the pool. In such cases GLI and ADT will reclaim against each other using standard interline reclaim factors.

GLI will be responsible for all interline express reclaiming to, and from, non-pool carriers for interline shipments that originate or terminate at pool locations.

**Additional
Stations:**  In the event that additional stations are open within the pool routes, they will report to GLI and their revenue will be included in the computation of revenue due ADT.

2

**EXHIBIT 8**

**EXHIBIT 8**

## EQUIPMENT STANDARDS

### AGE OF EQUIPMENT

The carriers will assign no single piece of equipment to the pool which exceeds 8 years in age. This requirement does not apply to equipment which is being used to operate extra sections, or to substitute equipment which is temporarily assigned to replace qualifying equipment that is being repaired or maintained so long as that substitute equipment is not used to operate more than 20% of the carrier's total pool miles.

### AVERAGE AGE OF FLEET

The carriers will not assign equipment to the pool which in the aggregate exceeds an average age of 6 years per bus and will not operate equipment in the pool which in the aggregate exceeds a weighted average based on miles operated of 6 years per bus. Substitute equipment which is temporarily assigned to the pool to replace qualifying equipment that is being repaired or maintained will be used in calculating the weighted average age of fleet, however, buses used to operate extra sections will not be included in the calculation of average age of fleet.

### MAINTENANCE STANDARDS

The carriers will establish and implement maintenance standards which are equal to or which exceed GLI's Continuous Quality Maintenance Program, GLI's Continuous Quality Cleaning Program, and GLI's Tire Program.

### EQUIPMENT SPECIFICATIONS

The carriers will only operate buses in the pool which at a minimum are intercity type buses that are not less than 40 feet in length, which are restroom equipped, which are climate controlled, which have underneath baggage and express storage compartments, which have automatic transmissions, which have reclining seats, and which meet all requirements of the American's with Disabilities Act.

### SAFETY STANDARDS

The carriers will only assign and operate buses in the pool operation which meet the greater of U.S. DOT, GLI or ADT safety standards.

**EXHIBIT 9**

## EXHIBIT 9

The following are the "Persons" as contemplated in paragraph 19 to the Revenue Pooling Agreement between ADT and GLI.:

1.  John J. VanGonsic, Sr.

2.  The present or future children of the Person listed in 1. above.

3.  The present or future children and grandchildren of those Persons listed in 1. And 2. above.

4.  Spouses who are married to, or are widows or widowers of those Persons listed in 1. through 3. above, provided, however, that such transfer is not part of a marriage dissolution or divorce settlement.