# Exhibit 7



July 26, 2013

Mr. Eugene J. Berardi, Jr.  VIA EMAIL: eberardijr@trailwaysny.com
President/CEO
Adirondack Transit Lines, Inc.
499 Hurley Avenue
Hurley, New York 12443

RE:  Revenue Pooling Agreement

Dear Gene:

## INTRODUCTION

Please accept this as Greyhound Lines, Inc.'s ("Greyhound") response to your letter of July 18, 2013 and previous communication with regard to the unresolved issues related to the Revenue Pooling Agreement, as amended (collectively "Agreement"). First, Greyhound would like to thank you for your detailed letter explaining the issues as perceived by Adirondack Transit Lines, Inc. ("Adirondack") and assure you that we value our relationship. Greyhound hopes by way of this letter to fully explain its position with respect to each issue raised in your letter.

## DISCUSSION

Pool Mileage
In 2011, Greyhound operated less than its share of miles as required by the Agreement. During 2012, Greyhound ran most of its required miles. However, the imbalance which was created in 2011 still exists today.

Greyhound has repeatedly offered to work off the miles. Greyhound has also tried to rectify the imbalance by making a generous offer to pay for the additional miles operated by Adirondack but it has become clear that Adirondack would prefer to get paid for the mileage imbalance than allow Greyhound to work it off. Greyhound agrees that the mileage rate in the pool is not adequate to compensate Adirondack for the additional miles operated during peak periods and has offered $4.17 per mile (for revenue miles only, not equipment miles).

Greyhound hereby extends this offer again—unconditionally—to pay $4.17 per mile to immediately balance the miles. Greyhound hereby commits that absent circumstances beyond its control, it will run 100% of its miles in the future and is prepared to run an additional 1,500 miles per day beginning in September. However, Greyhound is not interested in any way altering the revenue or operating pool mileage obligations in the Agreement. If Adirondack unilaterally adjusts the mileage rate as threatened in your letter, it may do so only prospectively and the adjusted rate would also apply to any miles that Greyhound would operate for Adirondack.

Greyhound has attempted to rebalance the miles by operating additional miles. Greyhound can only do this during non-peak periods because of its constraint on resources. However, Adirondack has repeatedly refused to allow Greyhound to run the extra miles because of Adirondack's need to continually run a certain number of miles in order to satisfy its labor requirements.

This is not a new issue for Adirondack. In 2006, Adirondack disagreed with the decision to reduce service to Long Island even though the level of service then being operated was not warranted by

passenger counts and was not financially successful. In petitioning Greyhound to allow the level of service to remain the same, Adirondack made it clear that it was largely due to union issues:

> The reactions of the Adirondack Labor Union to the schedule modifications made this spring are still causing me problems. . . .
>
> I am extremely concerned that a severe reduction or abandonment of service to Long Island would infuriate the U.T.U. local and damage further the relationship I have worked hard to develop with the leadership of this group.
>
> I cannot afford to antagonize this organization.

(July 27, 2006 letter from Eugene J. Berardi, Jr. to Gregory Alexander)

Greyhound expects that Adirondack will manage its labor union and costs in such a way that the pool operations will not have to subsidize Adirondack's operations in the future. Also with regard to labor, Greyhound would appreciate if Adirondack would cease cannibalizing its drivers after Greyhound has invested a tremendous amount of money in putting them through driving school. This activity is part of the reason for Greyhound's driver shortage in the area served by the pool.

With regard to deadhead miles, Adirondack is not alone in running such miles in support of the pool. As a small example, Greyhound ran more than 23,000 deadhead miles between June 19 and July 22, 2013 in support of the pool. Greyhound too is running substantial non-revenue miles for which it is getting no mileage credit. Thus, if Adirondack is to be compensated for the deadhead miles it operates, the same would apply to the miles operated by Greyhound.

Quality of Service
I was pleased to see that the heading for this subject was "**Quality** of Service." Greyhound could not agree more with your statement that "quality of service is of the utmost importance under the Pooling Agreement." However, it appears that the difference between the parties lies in the fact that while Greyhound is focused on quality of service, Adirondack is focused on quantity.

Most of the arguments by Adirondack under service relate to the change in operations from a capacity flexible system to a fixed capacity system. We realize that from an operational perspective, this differs from Adirondack's historical philosophy. As acknowledged in your letter in June 2006, "Adirondack's operating philosophy occasionally differs from Greyhound's." Thus, while the operation of a fixed vs. flexible capacity system may be a disagreement between the parties (which we hope will be resolved amicably), it does not constitute a violation of the Agreement.

The Agreement requires the parties to meet and confer over both "adequacy of schedules being operated over the Pooled Routes" and "customer service," among others items. (Agreement, 4(a)) Greyhound's customers have indicated over the years that overloading buses is not good customer service. In today's market, customers want to know when they are leaving. They want reserved travel. Competitors are offering reserved travel in the market served by the pool (see Megabus, Amtrak, Jet Blue and the other regional bus carriers) and we must do the same in order to compete.

The Agreement does not require that a certain quantity of service be provided and it specifically provides that "either of the parties *may* operate additional sections of a schedule." (Agreement, 3(c) (emphasis added) Thus, a reduction in the quantity of service is not contrary to the Agreement, so long as quality of service remains high. Our collective experience has shown that if we do not move to a fixed capacity system, quality of service will continue to decline because customers want guaranteed travel. This is supported by customer service feedback and complaints, which Greyhound would be happy to share with you.

Under the Agreement, "[t]he parties shall agree upon any changes in their service over the Pooled Routes to safeguard passenger satisfaction, and to foster economic and efficient operations that will preserve the business value of the Pooled Routes." (Agreement, 4(a))  Adirondack's refusal to embrace a fixed capacity system is negatively affecting service to pool customers, the growth of the pool and Greyhound's customers. In order to provide efficient travel for everyone, the pool operators need visibility to the number of customers they will be serving. This is not possible for passengers who purchase tickets from Adirondack on systems other than TRIPS.

Customers will also be better served by holding them to the schedule for which they purchased travel. Failure to do so results in inconvenience to other passengers who are then displaced by being unable to travel on the schedule that they chose. A prime example of poor customer service is the situation which occurred at the Port Authority in New York over Thanksgiving. Oversold service resulted in a multitude of passengers being stranded and the ultimate shutdown of the counters at the Port. This was not the result of a capacity constrained system as that had not been implemented at the time. I am hopeful that Adirondack would agree that the parties cannot allow this to happen again.

The additional customer service issues pointed out by Adirondack include delays, breakdowns, dirty coaches and cancelled schedules because there was no coach or driver available. Adirondack is fully aware of the resources that Greyhound has dedicated to customer service, not the least of which has been training, which was not mirrored on the Adirondack side to the best of Greyhound's knowledge.

Greyhound is the first to admit that it indeed experiences delays, breakdowns, dirty coaches and cancelled schedules and will continue to do so in the future. While Greyhound has no intention of throwing mud back at you, a quick review of our records indicate numerous customer service complaints involving Adirondack service in the pool. (See customer service complaint attached.)

With regard to delays, Adirondack had multiple delays on July 20, 2013: ADT 272 second section—89 minutes late; ADT 319—45 minutes late; ADT 278—118 minutes late; and ADT 296—53 minutes late. On this same date, Adirondack also cancelled a planned double of ADT 316 and left passengers standing at the gate. The second section of ADT 319 was also cancelled and at least one passenger was forced to stand. On the following day (July 21, 2013), ADT did not run the planned third section of ADT 316 and five passengers were left behind as a result of refusing to run planned capacity. Also on July 21, Adirondack did not operate ADT 259 which caused Utica to not be served. Greyhound has learned that ADT 259 was not operated because it would have resulted in a driver shortage for Adirondack the following day.

The first three bullet points on page 5 of your letter all relate to capacity and the parties' ability to anticipate and serve capacity. If all parties were operating in a reservation environment, these issues would be eliminated.

Greyhound will continue to support Adirondack in whatever way possible in an effort to better plan for all customers. This is not a new issue and in fact, the parties agreed in 1999 that all Adirondack tickets would be sold in TRIPS: "on or before March 31, 2000, the TRIPS ticketing system will be installed at all automated ADT terminals or agency stations. Thereafter, all passenger tickets issued by ADT at its automated locations on the Pooled Routes will be sold using the TRIPS system and GLI ticket stock." (Second Amendment of Revenue Pooling Agreement, Section 1)  Greyhound hereby pledges to continue to work with Adirondack on these issues and, using set-ins to the best of the parties' collective resources, provide the best customer service possible.

Inappropriate efforts to attribute miles to the pool
Adirondack is fully aware, having consulted with Vinson & Elkins, that an allegation of fraud is a very serious one. Greyhound unequivocally denies and takes great offense to your claim that it has committed fraud and hereby formally requests that Adirondack produce at its earliest convenience all information (written and electronic) to support its allegations of "inappropriate efforts to attribute miles to the pool."

With regard to "pushing doubles" and "secretly . . . charging dead-head miles to the pool and trying to cover up what it is doing," Adirondack should have been advised that in order to be successful on a claim of fraud, it must have "clean hands." That appears from a quick look not to be the case.

Between July 17 and July 19, 2013, Greyhound ran a total of two extra sections with 10 passengers or less. During this same time frame, Adirondack ran three times that number of extra sections (6) with 10 passengers or less.

Going back a little further, Adirondack ran a third section of ADT 316 on June 28th, serving a total of 88 customers. All 88 customers could have been accommodated on two sections. Between June 27th and July 7th, ADT ran 26 extra sections with less than 10 passengers for a total of 2,840 miles. During this same time period, Greyhound ran 27 extra sections with less than 10 passengers for a total of 3,305 miles. The percentage of these miles operated by each party nearly corresponds to the number of miles required by each party to be operated under the Agreement. Additionally, Greyhound ran 6,700 deadhead miles within the pool (not including NYD) between June 27 and July 7, 2013.

Again, please provide any and all evidence to support your accusations of fraud, including but not limited to the report referenced at the bottom of page 6/top of page 7 of your letter.

Administrative procedures for computing the monthly revenue pool settlement
As you know, the Agreement says nothing about the administrative procedures for computing the monthly revenue pooling settlement. The parties have jointly developed a methodology over the life of the pool and Greyhound is happy to discuss any changes that you may require and whether Greyhound can provide the information you need (for example, the corridor accounting information noted in your letter).

Greyhound agrees to work with Adirondack to update the procedures and process for calculating the costs of operating the pool. The advent of the internet has added a factor that was not originally contemplated at the time the Agreement was created, including credit card fees. Insofar as the intent of the cost calculation is to equitably and fairly reimburse Greyhound for the actual costs incurred within the pool, Greyhound will work with Adirondack to come to a mutually agreeable solution. As you know from our previous discussions on this topic, the parties need to find a solution to be implemented as of the start of the next calendar year to be used going forward. Greyhound intends to address, to the best of its ability, the costs and treatment of the internet sales channel as well as any issues related to the loss of interline commission when one carrier assumes responsibility for pool sales, if any. However, both parties need to understand that some items, by the nature of the data and information available, may be impossible to adequately calculate, particularly in a reasonable manner, and therefore may be excluded from the discussion unless both sides can agree on a reasonable and expeditious methodology. The calculation of unredeemed tickets may fall into this category.

Also as we have discussed, Greyhound intends to seek reimbursement from Adirondack for uncompensated operational costs going back to the last time costs were analyzed. The methodology Greyhound proposes to use is the last agreed upon methodology, updated to reflect actual operational costs. No matter the source of the sale, revenue derived from all sales must be used to cover the costs of operating the pool: "The revenues which shall be the subject of this Agreement . . . are gross amounts received by ADT and GLI from the sale of passenger tickets and package express shipments handled, regardless of where or by whom the tickets were sold. . . ." (See Agreement, 1(b)) For example, Adirondack is not reporting internet sales.) Greyhound operates nearly all of the terminals in the pool and must be fairly compensated for its costs.

## CONCLUSION

Greyhound values the long-standing relationship it has had with Adirondack and its principals and hopes that it will continue in the future. We agree that the issues raised in your letter and in our previous communication should be addressed and resolved in one agreement as opposed to piecemeal. The Agreement at issue is for a term for 30 years. Clearly, the parties anticipated and expected that not all issues which would arise over a 30-year period would be covered in the Agreement and that over the course of three decades; the business would change and evolve. In fact, it has changed and evolved, particularly with the advent of the internet. The internet and the fixed vs. flexible capacity model need to be addressed along with the other issues the parties have raised. Greyhound is willing and ready to do this. However, both parties must be willing to open up everything and work toward a comprehensive solution. It will be a complicated process, but if both sides enter with a common goal, it is possible.

To that end, we would like to meet in Chicago to discuss these issues. We are available for an all-day meeting beginning at 9 am on August 29th. Please let us know your availability.

Yours truly,

*Ted Burk*

Ted Burk
Senior Vice President, Corporate Development

CC:  Dave Leach
     Bill Blankenship
     Andy Kaplinsky
     Trisha Martinez